ACCEPTED
12-15-00149-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
6/26/2015 3:50:46 PM
CATHY LUSK
CLERK

# NO. 12-15-00149CV

IN THE COURT OF APPEALS
FOR THE
TWELFTH DISTRICT OF TEXAS
TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

6/26/2015 3:50:46 PM

CATHY S. LUSK
Clerk

# In Re
# Charles Dwayne Lankford
# And Roberta Gresham,
# Relators

———————

From the County Court at Law Number One
ANGELINA COUNTY, TEXAS

---

## RESPONSE TO PETITION FOR WRIT OF MANDAMUS

---

THOMAS W. DEATON
State Bar Number: 05703500
Email:
tommydeaton@lufkinlaw.com
CAROLYN CARTER BELL
State Bar Number: 00787061
Email:  cbell@lufkinlaw.com
Deaton Law Firm
103 E. Denman
Lufkin, Texas  75901
Telephone:  (936) 637-7778
Facsimile:  (936) 637-7784
Attorneys  for  Stephanie  Smith,
Real Party in Interest

**ORAL ARGUMENT REQUESTED**

# SUPPLEMENTAL LIST OF PARTIES

The undersigned counsel of record supplements Relators' List of Parties and certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| Real Parties in Interest | Counsel |
|---|---|
| Stephanie Smith | Thomas W. Deaton<br>DEATON LAW FIRM<br>103 East Denman<br>Lufkin, Texas 75901<br><br>Carolyn Carter Bell<br>DEATON LAW FIRM<br>103 East Denman<br>Lufkin, Texas 75901 |
| Karla Sue Frith | Unrepresented |

| Relators | Counsel |
|---|---|
| Charles Dwayne Lankford | Robert T. Cain, Jr.<br>Robert Alderman, Jr.<br>ALDERMAN CAIN & NEILL, PLLC<br>122 East Lufkin Avenue<br>Lufkin, Texas 75901 |
| Roberta Gresham | Robert L. Flournoy<br>LAW OFFICES OF ROBERT L. FLOURNOY |

P.O. Box 1546
Lufkin, Texas 75902

**Respondent**

The Hon. Joe Lee Register
Judge of the County Court at
Law Number One of Angelina
County, Texas
P.O. Box 908
Lufkin, Texas 75902

/s/ *Thomas W. Deaton*
Thomas W. Deaton

# TABLE OF CONTENTS

SUPPLEMENTAL LIST OF PARTIES…………………………………..…..i

TABLE OF CONTENTS………..…………………………………….......iv

INDEX OF AUTHORITIES……………………………………………vi

STATEMENT OF THE CASE…………………………………………. 1

STATEMENT OF JURISDICTION………………………………….…2

ISSUE PRESENTED……………………………………………….…...2

STATEMENT OF FACTS……………………………………………..2

SUMMARY OF ARGUMENT………………………………………...10

ARGUMENT AND AUTHORITIES………………………………….11

I.    Actual Possession – Has Stephanie Smith had Actual Possession of T.D.L. for the Requisite Time?...........................................11

II.    Actual Care – Has Stephanie Smith Provided Actual Care for T.D.L.?.....................................................................................................12

III.    Control – Did Stephanie Exercise Actual Control over T.D.L.?...16

CONCLUSION…………………………………………………... 25

PRAYER……………………………………………………………….28

CERTIFICATION OF REVIEW…………………………………….28

CERTIFICATE OF COMPLIANCE WITH TRAP 9.4(I)…………….29

CERTIFICATE OF SERVICE…………………………………………29

AFFIDAVIT OF THOMAS W. DEATON.......................................31

SUPPLEMENTAL RECORD

INDEX TO APPENDIX TO RESPONSE TO WRIT OF MANDAMUS

APPENDIX

# INDEX OF AUTHORITIES

## CASES

*T.W.E. v. K.M.E.,* 828 S.W.2d 806
(Tex.App.—San Antonio 1992, no writ)……………………….……11, 25

*Jasek v. Tex. Dept. of Family and Protective Services*
348 S.W.3d 523  (Tex. App.—Austin 2011…............11, 21, 22, 24, 25

*In Re Fountain* 433 S.W. 3d 1; 2012, Tex. App Lexis 1081……….……..20

*In re Kelso* 266 S.W.3d at 590-591
(Tex. App. – Fort Worth 2008, orig. proceeding)…..........…21, 23, 25

*In re KKC*, 292 S.W.3d 788, 792-93
(Tex.App.—Beaumont 2009, no pet.)…………………………..21, 22

*Lee v. City of Houston,* 807 S.W.2d 290, 295, (Tex. 1991)…………….….…22

*In the Interest of ACFH and DABH* 373 S.W.3d 148, 153
(Tex.App. San   Antonio 2012)……………………….……………..24

## STATUTES

TEX. FAM. CODE
§102.003(a)(9)…………………………………………………...11, 20, 21, 23, 25

# RESPONSE TO PETITION FOR MANDAMUS

Stephanie Smith, a real party in interest in this proceeding, submits this response to petition for writ of mandamus filed by Charles Dwayne Lankford and Roberta Gresham complaining of the order of the Honorable Joe Lee Register, County Court at Law Number One of Angelina County, Texas, overruling their pleas to the jurisdiction.

## STATEMENT OF THE CASE

Stephanie Smith agrees in principal with Relators' Statement of the Case and adopts the appendix of the Relators and agrees that the appendix contains sworn, redacted copies of relevant pleadings, discovery request, motions, and hearing transcripts. We as well have attached an appendix that includes our cited authority that is not included in Relators' appendix and we have attached the supplemented record which is the transcript of the trial court's interview with T.D.L. We refer to the material in Relators' appendix by referring to Relators' cite stamp number "R__" as it appears on the right side of the bottom of each cited page.

## STATEMENT OF JURISDICTION

Pursuant to TRAP 52.4(c), Stephanie Smith has omitted a statement of jurisdiction.

## ISSUE PRESENTED

Stephanie Smith, a real party in interest, adopts the issue presented by Relators.

## STATEMENT OF FACTS

Stephanie Smith agrees with Relators that the procedural history as well as the factual history of this case requires "some untangling" and has provided a timeline that Smith believes sets out both the factual and procedural history that brought the parties to this juncture.

**In March 22, 2002**, T.D.L. was born to Charles Dwayne Lankford and Karla Sue Lankford (R90), now known as Karla Sue Frith.

**On February 20, 2003**, Charles Dwayne Lankford and Karla Sue Lankford were divorced in Angelina County, Texas. Charles was named sole managing conservator of T.D.L. and her brother, and Karla

2

Lankford was named possessory conservator with limited and restricted visitation.  (R89-103).

**On September 3, 2004**, because of his absence from the country, Charles filed a Motion to Modify in Suit Affecting the Parent-Child Relationship and gave up managing conservatorship to T.D.L. in favor of his mother, Roberta Gresham.  An Agreed Order in Suit to Modify Parent-Child was entered on September 8, 2004 naming Roberta as managing conservator and relegating Charles to possessory conservatorship of T.D.L. but giving him no periods of visitation. (R84-88).

**In January of 2007** Charles and T.D.L, who was four years old and had had virtually no contact with Karla, her biological mother, began living with Stephanie Smith in her home to the exclusion of the managing conservator, Roberta Gresham.  Roberta relinquished care, possession and control of T.D.L. to Charles and Stephanie and abdicated her responsibilities as managing conservator. (R29-31).

**In March of 2008** Charles began working for Landmark Construction and continued his employment there until February 2012.

His work required that he travel throughout the United States, and he was away from home 70% to 80% of the time.  (R30), (R145).  During the nearly four year period Charles worked for Landmark Construction, T.D.L. lived in Stephanie Smith's home and under her sole care. (R30).

**On August 24, 2008** Charles and Stephanie Smith married, and Stephanie continued to care for both T.D.L. and Charles' son who was also in the home.  Charles was away from home approximately 70% to 80% of the time. (R29-31) (R145).

**On October 14, 2009** Charles sued his mother, Roberta, by filing a Petition to Modify Parent-Child Relationship requesting that he be named sole managing conservator and that Roberta be named a possessory conservator of T.D.L.  The order Charles sought to modify was the order rendered on September 8, 2004 naming Roberta Gresham sole managing conservator of T.D.L. (R82-83).

**On December 7, 2009** Temporary Orders in Suit to Modify Parent-Child Relationship were entered naming Charles, Karla Sue Lankford, and Roberta Gresham temporary joint managing conservators of T.D.L. with Charles having the exclusive right to

designate the primary residence of T.D.L. and Roberta having some limited visitation. (R76-79). Charles was away from home most of the time and T.D.L. was in Stephanie's care. Even though Roberta as joint managing conservator had the right to possession of T.D.L., she failed to exercise any of her periods of possession (R30) and went almost two years without seeing T.D.L. (R140-141).

**In December 2010** Roberta Gresham, still a joint managing conservator of T.D.L. stopped all contact with Charles, Stephanie, and T.D.L. (R30).

**On April 20, 2011** a dismissal order was entered dismissing the Petition to Modify Parent-Child Relationship that Charles had filed on October 14, 2009. (R75). The dismissal of the petition revived the prior order entered on September 8, 2004, putting Charles back in the position of possessory conservator of T.D.L. with no visitation and Roberta Gresham back in the position of sole managing conservator of T.D.L. Roberta continued to relinquish care, control, and possession of T.D.L. to Stephanie and Charles, who was away from home most of the time. (R30).

**In May 2012** Charles accepted a job with Caddell Construction, a job which required that he live nearly 8,000 miles from home in Afghanistan. Charles voluntarily chose expatriate status which meant that he could return to the United States only 35 days or less each year. (R135-136).

**In July 2012** Charles left for Afghanistan, and he continues to be employed by Caddell Construction and working in Afghanistan today. (R 135) During his time in Afghanistan, Charles is gone approximately 90% - 94% of the time, returning home between 21 days (R31) and 35 days (R135) per year. T.D.L. remains exclusively in Stephanie's care. (R31).

**In August 2012**, after cutting off contact with Charles, Stephanie, and T.D.L. in December of 2010, Roberta Gresham renewed contact with them for the first time in nearly two years, and as sole managing conservator she continued to allow T.D.L. to live with Charles and Stephanie, knowing that Charles was living outside the country and absent from home most of the time. (R30-31), (R143).

**In October 2014**, from Afghanistan, Charles informed Stephanie that he wanted a divorce.  (R118).

**On November 14, 2014**, Stephanie filed an Original Petition for Divorce and Petition in Suit Affecting Parent-Child Relationship in Angelina County.  Stephanie requested that she and Charles be appointed joint managing conservators of T.D.L. and that she be designated as the conservator with the exclusive right to determine the primary residence of T.D.L.  (R62-71).

**On December 1, 2014**, Stephanie filed Petitioner's Motion to Sever and to Consolidate Cause of Action asking that the Petition in Suit Affecting Parent-Child Relationship be severed and consolidated with the existing SAPCR, Cause Number 35,254-02-11.  (R57-58).

**On December 2, 2014**,  Charles filed Respondent's Original Answer and Counter-Petition for Divorce and Original Answer in Suit Affecting the Parent-Child Relationship  (R43-53) and Respondent Lankford's Motion to Sever (R40-42).

**On December 5, 2014**, the trial court entered the Order Granting Plaintiff's Motion to Sever and to Consolidate Severed Cause

of Action, severing the Suit Affecting Parent-Child Relationship and consolidating it with the existing cause number.  (R32).

To recap the timeline, it shows that during the period September 8, 2004 to January 2007, Roberta was the sole managing conservator of T.D.L., and Charles was a possessory conservator with no provision for visitation. While Charles worked away from home, T.D.L. lived with Roberta until January 2007 when Charles, T.D.L. and Stephanie began living together and Roberta, as sole managing conservator, relinquished care, control, and possession of T.D.L. to Charles and Stephanie.

From January 2007 to December 7, 2009, Roberta remained sole managing conservator of T.D.L., but she continued to relinquish care, control and possession of T.D.L. to Charles and Stephanie even though she knew that Charles was away from home 50% to 70% of the time. (R29-31).

From December 7, 2009 until April 20, 2011, Charles was the joint managing conservator with the exclusive right to designate the primary residence of T.D.L.  He worked away from home 70% of the time (R30), (R45).  This period is the only hiatus during which Roberta was not the

8

managing conservator with the exclusive right to designate the primary residence of T.D.L.

From April 20, 2011to May 12, 2015 Roberta was sole managing conservator with the exclusive right to designate the primary residence of T.D.L., the order entered on September 8, 2004 having been revived. During this time, Roberta, as sole managing conservator, continued to relinquish care, control and possession of T.D.L.  During this period Charles was away from home 70% (R29-31) to 94% (R135-136) of the time, and Stephanie was the sole caretaker of T.D.L.

As managing conservator Roberta had the exclusive right to determine the primary residence of T.D.L.; however, Roberta did not move T.D.L. into her home, continued to have no contact with T.D.L. (R30-31), took no role in parenting T.D.L., had no day to day contact with T.D.L., and made no decisions regarding T.D.L. ( R143).  Roberta acknowledged that while she was sole managing conservator, she did not see T.D.L. for a period of two years (R201).  Roberta acknowledged that on March 5, 2015, she did not know who T.D.L.'s teachers were. (R201).

9

One thing the parties agree on is that during the past 8 years Stephanie Smith has been a good mother to T.D.L. (R154 -155). With little help from either Charles or Roberta she has reared a child who is successful in almost every aspect of her life including academics and sports.

**SUMMARY OF THE ARGUMENT**

This case presents the question of how to define *actual care, control, and possession.* Texas Family Code §102.003(a)(9) gives standing to file an original suit to *a person, other than a foster parent, who has actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition.* The courts of appeals are divided as to whether the statute requires legal, exclusive care, control, and possession or whether it requires non-exclusive but permanent and consistent care, control, and possession. The majority of the courts have adopted what we believe is the better reasoned course finding that the term actual control need not be legal control and that the party seeking standing need not have exclusive control.

## ARGUMENT AND AUTHORITIES

The purpose of Texas Family Code §102.003(a)(9) is to create standing for those who have developed and maintained a relationship with a child over time, *T.W.E. v. K.M.E.,* 828 S.W.2d 806, 808 (Tex App—San Antonio 1992 , no writ); *Jasek v. Tex. Dept. of Family and Protective Services,* 348 S.W.3d 523 (Tex. App – Austin 2011). There is no doubt that Stephanie Smith developed and maintained a relationship with T.D.L. over an extended period of time.

I.      Actual Possession – Has Stephanie Smith had Actual Possession of T.D.L. for the Requisite Time?

Stephanie Smith has had possession of T.D.L. for more than 8 years. When Stephanie began living with Charles in 2007, T.D.L. was nearly 5 years old; she is now 13 years old. The record shows that since January 2007 Stephanie has had continuous and uninterrupted possession of T.D.L. Because of Charles' extended absence from the home, Stephanie was the sole caretaker of T.D.L. a minimum of 50% of the time up to 94% of the time (R30), (R29-31), (R135),(R145). The managing conservator, Roberta, relinquished possession of T.D.L. and

11

abdicated her responsibilities as managing conservator, even going for a period of two years without contacting or seeing T.D.L. (R29-31) , (R140-141).  When asked T.D.L.'s age on cross examination, Roberta was unable to respond correctly.  (R 203).  Contrary to Relator's assertion that he, T.D.L. and Stephanie lived in "his" house, the home in which they lived belonged to Stephanie. (Transcript of Court's Interview with T.D.L., Page 6, Lines 22-23).

II.    Actual Care – Has Stephanie Smith Provided Actual Care for T.D.L.?

Stephanie Smith assumed all the usual responsibilities and duties of a parent, and in both her mind and the mind of T.D.L. she fills the role of mother.  Children want to be in a place where they feel secure and with people who love them.  It is without doubt that T.D.L. has forged a strong relationship with Stephanie, her primary caretaker for most of her life, and considers Stephanie to be her mother.

During direct examination by Roberta's lawyer, Stephanie Smith testified as follows:  (R185 -186).

Line 23    Q.    And who is the mother listed there?

A.     Stephanie Lankford.

Q.     That's you, right?  You're not her mother, are you?

A.     No, I'm not her birth mother; but, yes I am her mother.

Q.     You love her and she loves you and ---

A.     I didn't give birth to her, if that is what you want to know, but I am her mother.

(R187 -188)

Q.     And in that do you also show on that – put in here that you are the mother, correct?

A.     Yes, sir.

Q.     And then down here you say that you are stepmom.

A.     Yes, sir.

13

Q.      Okay.  So which is it?

A.      By paper I'm stepmom, but in her eyes I'm her

mother.

During the Court's interview with T.D.L. the child reflected

Stephanie's sentiments regarding their relationship as mother and child

as follows:

Transcript of Court's Interview with T.D.L., Page 11, Lines 7-11

Line 7      Q.      How do you consider Stephanie?  Is that your

stepmother or –

A.      I consider her as my mom.

Q.      You consider her as your mom?

A.      Yes, sir.

On cross-examination by her lawyer, Stephanie Smith testified as

follows:  (R173)

Line 11     Q.      Tell the Court what relationship you have with

her regarding responsibility of this child?

14

A.    She's my daughter, and I love her.

Charles acknowledged that a parent-child bond existed between Stephanie and T.D.L.  During cross-examination by Stephanie's lawyer, Charles testified as follows: (R154-155)

Q.    Have you ever sent or texted an email complimenting Ms. Lankford, Ms. Smith, your wife, on how well she has taken care of the child?

A.    Yes.

Q.    In fact, she is a good mother, isn't she?

A.    She does treat her well, yes.

Q.    And, in fact, it's not odd that the child should bond with her and consider her as her mother, is it, sir?

A.    No, it is not odd.

Stephanie Smith took T.D.L. to the doctor when she was ill and for well-child checkups and immunizations, informing Charles after the fact.  (R164-165).  Stephanie Smith fed and clothed T.D.L., took care of

15

her when she was ill, (R 211), enrolled her in school, took her to school, helped her with her home work , helped her study for tests,  disciplined her, instilled in her spiritual precepts, taught her right from wrong, took her to church, and taught her to be a young lady. (R171-174).

III.    Control – Did Stephanie Exercise Actual Control over T.D.L.?

After hearing the evidence in a hearing that lasted several hours and after hearing testimony from five witnesses Judge Register, the sitting judge in Angelina County Court at Law Number One who happens to be a board certified family law expert, made the following finding:  (R225).

Lines 5-12        *And my finding is she's going to get to stay in court, and she's got standing for the simple reason is because the father let her have that standing basically by his actions.  That is to say, Mr. Lankford,* **you relied on your wife to take over the parental role of the mother of the child** *(emphasis added), and I think in doing so you let her in the door.*

For a period of more than 8 years, Stephanie Smith, because of the absence of Charles and the inattentiveness of Roberta, assumed actual

control of T.D.L.'s life. The child has lived in Stephanie's home for several years, Stephanie tended to her physical and emotional needs on a daily basis, she enrolled her in school, was listed as a parent on T.D.L.'s school records, attended school activities, communicated directly with her teachers, took her to school and picked her up from school, prepared her meals, and oversaw her homework. (R 170-173).

The apathy and inattentiveness of Roberta, the managing conservator, and of Charles, the father and possessory conservator, is reflected when looking at the list of persons authorized to pick up T.D.L. from school. Neither Charles, the father, nor Roberta, the managing conservator are mentioned on that list. The only individuals on the list are Stephanie Smith, her two sisters, and her mother. (R172-173). The school emergency contacts are predominately Stephanie Smith's family, her two sisters who are listed as T.D.L.'s aunts and her mother who is listed as T.D.L.'s grandmother. (R276, 279).

While Roberta's name, address and signature appear on some school records for purposes of enrollment, the record is clear that T.D.L.

resided in Stephanie Smith's home and Stephanie had ongoing physical custody and daily control of T.D.L.

Both Roberta and Charles admitted that they did not know who T.D.L.'s teachers were. (R20-202), (R147). Charles admitted that he had never attempted to contact T.D.L.'s teachers or ever made a direct inquiry to any teacher about T.D.L. (R148) and further admitted that the only contact he had with school was through his wife, Stephanie, (R148) indicating that he had abdicated his parental responsibility to Stephanie. Contrary to Charles' testimony that he remained in close contact with T.D.L. talking with her on the phone twice each week while he was away from home (R120, 138, 151), when asked how many times since 2008 Charles had called home and asked to speak to T.D.L., Stephanie testified that when he called home he never called to speak to T.D.L. (R178).

When responding on cross examination, Charles testified as follows: (R148).

Line 14 Q.    And you have relied on your wife to take care of

Line 15    everything regarding this child from the time that you

18

married her until the present time; is that right?

A. I have allowed her to take care of things in my absence, yes.

Stephanie Smith was authorized to make medical decisions and consent to medical treatment and hospital care for T.D.L. (R264, 265) Agreeing that he was gone from home at least 80% of the time, Charles acknowledged that he gave his consent for Stephanie to make medical decisions regarding T.D.L. at least 80% of the time. (R146).

T.D.L. is a bright, precocious, young lady who is considered by almost everyone to excel in sports including basketball and softball. Stephanie and her family are T.D.L.'s biggest fans, attending all of her sporting events. Sadly, Roberta Gresham, the sole managing conservator, and Charles, T.D.L.'s father, have never attended any of T.D.L.'s games. (R202), (R137). Robby Fletcher, T.D.L.'s basketball and softball coach, who coached her for some 26 games during the school year 2014-2015 and conducted practices two times a week for the entire school year testified before the trial court, and when asked if he knew Charles, he replied that he had never seen him before. When asked if

19

he knew Roberta, Mr. Fletcher's response was the same. When asked who brought the child to practice, he testified that Stephanie Smith brought her 99% of the time and her brother, Ms. Smith's older son, brought her the remainder of the time. (R206-207) As in every other aspect of T.D.L.'s life, Stephanie Smith has taken actual control.

Undoubtedly, Stephanie Smith, based on the *Jasek* standard, has developed and maintained a relationship with T.D.L. over a long period of time. It might be argued that Stephanie's possession of T.D.L. was not exclusive in that Charles contended that he retained certain rights in the child, particularly the rights to control. However, the First Court of Appeals held that the actual care, the actual control, and the actual possession of the child need not be exclusive, *In Re Fountain* 433 S.W. 3d 1; 2012, Tex. App Lexis 1081 and that requiring exclusivity would impose a requirement not intended by the Legislature. *Id.* at 4.

The Third Court of Appeals in Austin analyzed the concept of control in Texas Family Code 102.003(a)(9) and disapproved of the notion that "actual control" necessarily meant legal authority to make decisions for the child. The Austin Court correctly points out that the word "actual" as used in 102.003(a)(9) is intended to indicate something

20

that exists in fact as opposed to something that is a function of legal duties or imputation. *Jasek v. Tex. Dept. of Family and Protective Services,* 348 S.W.3d 523, 535-536 (Tex. App – Austin 2011).

The Austin Court of Appeals disagreed with the case out of the Fort Worth Court of Appeals, *In re Kelso,* 266 S.W.3d 586, 590 (Tex.App – Fort Worth 2008, no pet.) as well as the case out of the Beaumont Court of Appeals, *In re KKC*, 292 S.W.3d 788, 792-93 (Tex.App.— Beaumont 2009, no pet.). In both of these cases the Fort Worth court and the Beaumont court held that to meet standing requires "legal control" over the children, ignoring the wording in the statute that requires "actual control."

In the case *In re Kelso,* the Fort Worth court held that the Petitioners lacked standing under Texas Family Code § 102.003(a)(9) because they could not show they had actual care, control, and possession since they only had possession of the child if the mother gave her permission. The court found that the mother maintained control as to when and for how long the child stayed with Petitioners and had not voluntarily relinquished permanent care, control, and possession of the child to Petitioners for the requisite time before filing their suit. *In re*

*Kelso* 266 S.W.3d at 590-591 (Tex. App. – Fort Worth 2008, orig. proceeding).

Disagreeing with *Kelso,* the Austin court held that there is no language in §102.003(a)(9) that requires voluntary relinquishment of care, possession, or control of the child by the parent or conservator. *Jasek v. Tex. Dept. of Family and Protective Services,* 348 S.W.3d 523, 535 (Tex. App – Austin 2011). A court cannot add words to a statute; that is solely the Legislature's prerogative. *Lee v. City of Houston, 807 S.W.2d 290, 295 (Tex. 1991).*

In the case *In re K.K.C.*, the Beaumont court found that the former boyfriend who has resided in the home with the biological mother and the child lacked standing because he had no legal right of control over the child and no authority to make decisions on behalf of the child. *In re KKC,* 292 S.W.3d 788, 792-93 (Tex.App.—Beaumont 2009, no pet.).

The Austin court disagreed with the Beaumont court's holding in *In re KKC* that to establish standing, a party had to have the legal right of control over a child. In *In re KKC* the biological mother resided in

the home with the Petitioner and the child. There was no indication she abdicated her parental rights and no evidence that all parental responsibility was turned over to Petitioner. However, in the case at bar, the parent and the managing conservator were absent and Stephanie assumed the role of and responsibilities of a parent, whether legally or constructively. Charles, who was gone from home the majority of the time, was willing to give Stephanie all legal right to make decisions for the child. The case at bar can be harmonized with cases from the Beaumont court and with *In re Kelso* from the Fort Worth court.

The Austin court reasoned that requiring a person seeking standing under 102.003(a)(9) to have the ultimate legal right to control a child requires reading words into the statute that are not there and renders the word "actual" superfluous at best and meaningless at worst. In a legal context, "actual" is used to distinguish between something that exists in fact rather than as a function of legal implication. The court noted that if the Legislature wanted to limit standing only to those persons with the legal right to control a child, then it would have omitted the word "actual" or added the word "legal." The court

concluded that the Legislature used the word "actual" because it intended to confer standing on a person who had actual care, control, and possession of the child for at least six months and had developed and maintained a relationship with the child, as distinguished from a bare legal right of care control and possession. *Jasek v. Tex. Dept. of Family and Protective Services,* 348 S.W.3d 523, 532-537 (Tex. App – Austin 2011).

To establish standing, *Jasek* held that the party must show actual control, meaning the actual power or authority to guide or manage the child or the actual directing or restricting of the child without regard to whether the party has the legal or constructive power or authority to do so, and that actual control means the development and maintenance of a relationship with a child by a nonparent involving the actual exercise of guidance, governance, and direction similar to that typically exercised by a parent with his or her child, *Jasek v. Tex. Dept. of Family and Protective Services,* 348 S.W.3d 523, 532-537 (Tex. App – Austin 2011), see also *In the Interest of ACFH and DABH* 373, S.W.3d 148, 153 (Tex.App. San Antonio 2012) .

## CONCLUSION

The purpose of Texas Family Code §102.003(a)(9) is to create standing for those who have developed and maintained a relationship with a child over time, *T.W.E. v. K.M.E.,* 828 S.W.2d 806, 808 (Tex App—San Antonio 1992), no writ; *Jasek v. Tex. Dept. of Family and Protective Services,* 348 S.W.3d 523 (Tex. App – Austin 2011).

Contrary to the facts in the case *In re Kelso*, T.D.L. resided in the home of Stephanie Smith for a period of 8 years and during that time Stephanie made decisions regarding medical care and school enrollment, provided discipline, nurtured the spiritual aspect of her life, interfaced directly with her teachers, attended to her homework and studies, provided for extra-curricular activities, and took care of all of T.D.L.'s daily needs.

Consider that Relators who filed this action are the parent and grandparent of T.D.L., yet neither of them knew the names of T.D.L.'s teachers, had any contact with her teachers, had attended any of T.D.L.'s basketball or softball games, had met her coach or had any contact with him. When questioned by Judge Register about her desire

to visit Roberta, her grandmother, the child said she would be "a little bit" unhappy if she had to spend one week-end a month with her. (Transcript of Court's Interview with T.D.L., Page 8, Lines 8-12).

T.D.L. further said that if she had to go to Roberta's, she wanted Stephanie to go with her. (Transcript of Court's Interview with T.D.L., Page 8, Line 7). When Judge Register questioned the child about how much time she wanted to stay with her father when he was home she said she would go visit but she wanted to come home at night to stay with Stephanie. When the judge asked her to consider the possibility that her father might be home for 30 days, she replied that would be a long time for her stay with him. After being asked by Judge Register what would be the best arrangement for her to see her father when he was home, her reply was "maybe a weekend." (Transcript of Court's Interview with T.D.L., Page 13, Lines 6-16).

A nonparent must show actual control, meaning the actual power or authority to guide or manage the child or the actual directing or restricting of the child without regard to whether the party has the legal or constructive power or authority to do so, for a nonparent such as Stephanie Smith to have actual control means that she must have

26

developed and maintained a relationship with a T.D.L. involving the actual exercise of guidance, governance, and direction similar to that typically exercised by a parent with his or her child.  The question as to whether Stephanie met that burden is perhaps, best answered by Judge Register in his ruling when he stated:

> *That is to say, Mr. Lankford, you relied on your wife to take over the parental role of the mother of the child, and I think in doing so you let her in the door.*

## PRAYER

For the reasons stated, Stephanie Smith, a real party in interest, prays that the Court deny Relators' Petition for Writ of Mandamus and for such other and further relief as may be just.

Respectfully submitted,

DEATON LAW FIRM
103 East Denman
Lufkin, Texas 75901
Telephone: (936) 637-7778
Fax: (936) 637-7784

By: /s/ *Thomas W. Deaton*
　　Thomas W. Deaton
　　State Bar No. 05703500
　　Carolyn Carter Bell
　　State Bar No. 00787061
　　Attorneys for Real Party in
　　Interest, Stephanie Smith

## CERTIFICATION OF REVIEW

Pursuant to Texas Rule of Appellate Procedure 53.3(j), the undersigned counsel for real party in interest certified that he has reviewed this Response to Petition for Writ of Mandamus and concluded that every factual statement in the Petition is supported by competent evidence included in the Appendix, Record, and Supplemental Record.

/s/ *Thomas W. Deaton*
Thomas W. Deaton

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4(i)

This response was prepared in Century Schoolbook 14 pt. typeface using Microsoft Word 2010, and, in reliance on the word count of the computer program used to prepare the document, I certify that this response to petition for writ of mandamus contains 5020 words excluding those matters excluded by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ *Thomas W. Deaton*
Thomas W. Deaton

## CERTIFICATE OF SERVICE

I certify that the foregoing response to petition for writ of mandamus was electronically filed with the Clerk of the Court using the electronic case filing system of the Court.  I also certify that on June 26, 2015, a true and correct copy of the foregoing was served via e-service or e-mail on the following counsel of record and on Respondent.


Robert T. Cain, Jr.
Alderman Cain & Neill, PLLC
122 East Lufkin Avenue
Lufkin, Texas  75901
e-mail rcain@aldermancainlaw.com

Robert Alderman, Jr.
Alderman Cain & Neill, PLLC
122 East Lufkin Avenue
Lufkin, Texas  75901
e-mail balderman@aldermancainlaw.com

*Counsel for Relator Charles Dwayne Lankford*

Robert L. Flournoy
Law Offices of Robert L. Flournoy
P.O. Box 1546
Lufkin, Texas 75902-1546
e-mail bob@rlflournoylaw.com

*Counsel for Relator Roberta Gresham*

The Hon. Joe Lee Register
Angelina County Court at Law Number One
P.O. Box 908
Lufkin, Texas 75902-0908
e-mail lberry@angelinacounty.net

*Respondent*

/s/ *Thomas W. Deaton*
Thomas W. Deaton

# AFFIDAVIT OF THOMAS W. DEATON

STATE OF TEXAS §
§
COUNTY OF ANGELINA §

BEFORE ME, the undersigned authority, on this day personally appeared Thomas W. Deaton, who being first duly sworn, stated on his oath the following:

"My name is Thomas W. Deaton. I am over twenty-one years of age, am of sound mind, and competent to make this affidavit. Unless otherwise stated, all facts set forth in this affidavit are true and based on my personal knowledge.

"I am the attorney for Stephanie Smith, real party in interest in this case, and have been such since the case below was filed. Attached hereto is a true and correct copy of the Transcript of Court's Interview with T.D.L. on March 6, 2015 in the case below.

Said document is material to the response of real party in interest, Stephanie Smith and is included in the record in support of the foregoing Response to Petition for Writ of Mandamus.

_____
Thomas W. Deaton

31

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the 26th day of June, 2015, to certify which witness my hand and seal of office.

Barbara Knight
_____
Notary Public, State of Texas

BARBARA KNIGHT
Notary Public
State of Texas
My Commission Expires
09-11-2018

# SUPPLEMENTAL RECORD

FILED

2015 JUN 25 PM 2:38

REBA D. SQUYRES
CLERK DISTRICT COURT
ANGELINA COUNTY, TEXAS

BY_____ DEPUTY

SUPPLEMENTAL REPORTER'S RECORD

TRIAL COURT CAUSE NO. 35-254-02

IN THE INTEREST OF                )    IN THE COUNTY COURT
                                  .)
                                  )    AT LAW NO. 1
                                  )
T.D.L.                            )    ANGELINA COUNTY, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Court's Interview with Torrance DeAnn Lankford*
*in Chambers Outside the Presence*
*and Hearing of Counsel and Parties.)*

March 6, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BE IT REMEMBERED THAT on the 6th day of March, 2015, the above-entitled and numbered cause came on for hearing in the County Court at Law No. 1, Angelina County, Texas, before the Honorable Joe Lee Register, Judge, and the following proceedings were had, to-wit:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Reported by:

Mel Power, Texas CSR No. 264, CM
Former Official Court Reporter
COUNTY COURT AT LAW NO. 1, ANGELINA COUNTY, TEXAS
300 Champions Drive Apartment 901
Lufkin, Texas 75901
936.238.3543
Email: melreporter53@gmail.com

COPY

A-P-P-E-A-R-A-N-C-E-S

For the Movant:

Mr. Robert Alderman Jr.
ALDERMAN CAIN & NEILL PLLC
122 East Lufkin Avenue
Lufkin, Texas 75901-2805
aldermancainlaw.com
936.633.4209 - Fax 936.632.3336
SBOT No. 00979900

For the Respondent Lankford-Smith:

Mr. Thomas Weldon Deaton
DEATON LAW FIRM
103 East Denman Avenue
Lufkin, Texas 75901-3993
936.637.7778
SBOT No. 05703500

For the Respondent Gresham:

Mr. Robert L. Flournoy
P.O. Box 1546
Lufkin, Texas 75902-1546
936.639.4466
SBOT No. 07173000

SUPPLEMENTAL VOLUME 3 INDEX

March 6, 2015

Court interview with the child.................... 4

Reporter certificate.......................... 16

County Court at Law No. 1, Angelina County, Texas

March 6, 2015

P-R-O-C-E-E-D-I-N-G-S

(Reporter's Note:  Pursuant to
Court Order unsealing same,
the following occurred in
chambers outside the presence
and hearing of counsel and
parties.)

BY THE COURT:

Q.  Ma'am, you are ready for this thing to be over with, aren't you?

A.  Yes, sir.

Q.  I don't have a lot of time with you; but, you know, what I really, really want to make sure that you understand is that your being here today is simply something that I kind of want to find a little bit about. Okay?

A.  Yes, sir.

Q.  You haven't done anything wrong, and I am sure you love everybody, and I think they all love you.  But my job is to try to figure out a way to do something that's in your best interest.

A.  Yes, sir.

Q.  Right now you're, what, almost 13?  Are you 13 yet?

A.    I will be 13 March 21st.

Q.    Do you play basketball?

A.    Yes, sir.

Q.    You play at Hudson in junior high?

A.    Yes, sir.

Q.    Seventh grade?  Great grade, isn't it?

A.    Yes, sir.

Q.    How did you all do this year?

A.    I think we got first place.

Q.    Won district?

A.    We didn't go to district.

Q.    You all don't have a district, do you?  I mean, we used to play everybody, small schools, big schools, anybody that had a basketball team when we played out there.  Now you're playing softball?

A.    I have played softball.  I am not going to play this year.

Q.    You're not going to play this year?

A.    No, sir.

Q.    What were you playing?

A.    I played league ball.

Q.    League ball?

A.    Yes, sir.

Q.    You didn't play select?

A.    No, sir.

Q.   Well, I hope you still play ball.  I think it's good for you.  I think it's a lot of fun.  Are a lot of kids in Hudson good friends of yours?

A.   Yes, sir.

Q.   I hear you are not doing all that great in grades, but you could do better.  Am I right?

A.   Yes, sir.

Q.   Let's get this stuff put aside and get on to doing a good job on the grades.  Okay?

I kind of want to know how you feel.  And there are no wrong or right answers in what you say.  Okay?  I want you to speak from your heart.  Okay?

Right now there's two or three people that really want you to stay with them; but I want you to stay in a place not only that you are happy with, but it's in your best interest, where you're receiving the most benefit.

See, adults, they kind of take care of themselves, but they have got to take care of you because you're not an adult yet.

A.   Yes, sir.

Q.   So I know you have been staying at your dad's wife's home, and she's Stephanie?

A.   Yes, sir.

Q.   Is that okay with you if I call her Stephanie?

A.   Yes, sir.

Q.   You know who your mom is, don't you?

A.   Yes, sir.

Q.   And what do you call your grandmother?

A.   Sometimes I call her Granny, and sometimes I call her Roberta.

Q.   All right.  And you call your dad Dad or Daddy or what?

A.   Dad.

Q.   He stays gone a long time, doesn't he?

A.   Yes, sir.

Q.   What do you think about that?

A.   I think he should be home just a little bit more.

Q.   Okay.  Stephanie has requested that you be allowed to continue to reside over there with her.  What are your thoughts on that?

A.   That's where I want to stay.

Q.   Is that where you want to stay?

A.   Yes, sir.

Q.   If you were not able to do that and I said, "No, we are not going to do that," would it make you sad?

A.   Yes, sir.

Q.   Okay.  Do you get along with your granny pretty well?

A. A little bit.

Q. What are your thoughts about going to your granny's house?

A. I don't really want to go over there.

Q. You don't want to go over there? What is your deal with it?

A. If I go over there, I want Stephanie with me.

Q. If I were to say I would like for you to visit your grandma once or twice a month or a weekend or something like that, would that make you unhappy?

A. A little bit.

Q. Okay. Could you get around that?

A. Sir?

Q. Could you get around that? I mean, could you handle that?

A. Yes, sir.

Q. Okay. Of course, you can't go back with your daddy if he is in Afghanistan. That's not going to work. What if I were to say --

May I call you will Torie?

A. Yes, sir.

Q. Or Torrance is your other name.

What if I were to say I may allow you to stay over at Stephanie's -- I don't know yet -- but what if I said you would still have to see your granny a little

bit because your dad's gone, and that's his family, too? Could you handle both of those relationships, one being at Stephanie's most of the time and seeing your granny some?

A.   Yes, sir.

Q.   Would that work for you?

A.   I wouldn't want to over there; but, if I had to, I would.

Q.   Okay.  If you were given the opportunity or the choice of going to your grandmother's, how much time would you want to go over there?

A.   I wouldn't go over there much.

Q.   How much is "much"?

A.   Like maybe a weekend, and that's about it.

Q.   That's about it?

A.   Yes, sir.

Q.   Okay.  Does Stephanie take any action at all to, I guess, talk bad about your daddy or your granny?

A.   No, sir.

Q.   Does she ever -- does she encourage you to go over there?

A.   Yes, sir.  She tells me that it's -- that's good for me to go over there.

Q.   Where do you go to church?

A.   Well, we go to church with my Aunt Holly and my Uncle Buck at -- I forgot the name of it.

Court's Inverview with Torrance Lankford - 3-6-2015

Q. Where is it located?

A. Lufkin.

Q. Where in Lufkin?

A. Kind of around the doctor's office.

Q. Who is the preacher?

A. I don't know his name.

Q. Okay. Did you see him here today?

A. I didn't really pay attention who all was here.

Q. It is not Brother Boone, is it?

A. Maybe. His name sounds familiar.

Q. Is it a Pentecostal church? Is that the one?

A. Yes, sir.

Q. Do you feel like that's a good church to go to?

A. Yes, sir. I like it.

Q. Do you have friends over there?

A. No, sir. I just sit with my little cousins.

Q. Okay. They go there?

A. Yes, sir.

Q. All right. Is Stephanie strict on you?

A. With my grades, and she just wants me to act right and say "yes, ma'am" and "no, sir".

Q. Does Stephanie get mad at you sometimes or -- at least not mad at you, but does she correct you when you don't act right?

A. Not all the time. If I -- like, if I have a bad

grade or something, she'll help me bring it up or something.

Q.   Does she work with you on your grades in trying to get you ready?

A.   Yes.  I was having trouble in a class, and she helped me, studied my vocabulary.

Q.   How do you consider Stephanie?  Is that your stepmother or --

A.   I consider her as my mom.

Q.   You consider her as your mom?

A.   Yes, sir.

Q.   Do you ever think about your real mom in the penitentiary?

A.   Not much.

Q.   Have you seen her in a long time?

A.   Huh-uh.

Q.   How long has it been since you saw her?

A.   Maybe it was -- I think it might have been three summers ago.

Q.   Okay.  Well, that's not part of what we're here today about, you seeing your mom.  We're here today to try to find out, again, what is in your best interest and where you are going primarily to live.

A.   Yes, sir.

Q.   Tell me your first choice.

A. Stephanie's house.

Q. Is it a nice house?

A. Uh-huh.

Q. How do you get along with her son?

A. We get along good.

Q. Does he give you a hard time?

A. No, sir.

Q. Do you have your own room over there?

A. Yes, sir.

Q. You have got a brother, don't you?

A. Yes, sir.

Q. Or at least one that you know of that's 15. What is his name?

A. Mikel.

Q. Mikel.

Do you have any -- get to see Mikel or visit with him?

A. (Shakes head). Huh-uh.

Q. Do you get to see Mikel very much?

A. No, sir, just when he comes down to see his mother.

Q. Do you want to be required to see Mikel?

A. No, sir.

Q. When your father is in from Afghanistan when he's here, do you want to hang around him during that

time? Will that be okay with you?

A. Yes, sir.

Q. When I say "hang around with him," what would you want to do? How much time would you want to stay over there?

A. Well, like, when he's home, if I have to go there, I want to go over there. But when he's home, I would rather stay with Stephanie. But if I have to go over there, I'll go over there.

Q. Let's say he's here 30 days at a time?

A. That would be a long time.

Q. That would a long time?

A. (Nods head.)

Q. What would you think would be the best arrangement while he's in town for you to see him?

A. Like a weekend maybe.

Q. Where does your grandmother live?

A. In Hudson.

Q. Would it make you sad if I made you stay over there for a good bit of the 30 days?

A. Yes, sir.

Q. What if I were to make it where you stayed over there, like, Thursday through Sunday of the weeks that he's in? Could you handle that?

A. Yes, sir.

Q.    All right.  And you could handle a short time, maybe a weekend, with your granny during the rest of the year?

A.    Yes, sir.

Q.    Okay.  While you are at your grandmother's, I assume -- I hope that you could promises me you would try to be as happy as you could, if that is what I did?

A.    Yes, sir.

Q.    Can I get a promise out of you that you will work on your grades?

A.    Yes, sir, I promise.

Q.    Can I get a promise out of you that you will love everybody?  I think that's not too hard to do.

A.    I promise.

Q.    And I assume that you'll continue to be a good young lady?

A.    Yes, sir.

Q.    Okay.  Have you got anything else you want to tell me?  Now is the time.

A.    No, sir.

Q.    Okay.  All right.  That's all I wanted to talk to you about.  If you need to call me again, let me know.  Okay?

A.    Yes, sir.

THE COURT:  All right.  You can go back

outside.

          MS. LANKFORD:  Yes, sir.

                    -oOo-

THE STATE OF TEXAS )

) ss.

THE COUNTY OF ANGELINA )

I, Mel Power, Former Official Court Reporter in and for the County Court at Law No. 1 of Angelina County, State of Texas, do hereby certify that the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in chambers and were reported by me.

I further certify that this Reporter's Record of the Proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's Record is $80.00, paid by the Respondent.

WITNESS MY HAND this the 25th day of June, A.D. 2015.

/s/ Mel Power                                    (SEAL)

Mel Power, Texas CSR No. 264, CM
My Certification expires: 12/31/2016
Former Official Court Reporter
County Court at Law No. 1, Angelina County, Texas
300 Champions Drive Apartment 901
Lufkin, Texas 75901
936.238.3543 - Cell 325.812.3820
Email: melreporter53@gmail.com

INDEX TO APPENDIX

Real Party in Interest has adopted the Cases and Statute filed in Relators' Petition for Writ of Mandamus as noted on their Index of Appendix. Pursuant to TRAP §52.4(e) this Index of Appendix does not contain cases cited in this Response to Petition for Writ of Mandamus that are already contained in Relators' index, only those cases not in Relators' index are included.

**CASES**

*In Re Fountain* 433 S.W. 3d 1; 2012, Tex. App Lexis 1081

*In the Interest of ACFH and DABH* 373 S.W.3d 148, 153 (Tex.App. San

    Antonio 2012)

*Lee v. City of Houston* 807 S.W.2d 290 (Tex. 1991)

# APPENDIX



**IN RE TAMMY FOUNTAIN, Relator**

**NO. 01-12-00704-CV**

**COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON**

*433 S.W.3d 1*; *2012 Tex. App. LEXIS 10801*

**December 28, 2012, Opinion Issued**

**PRIOR HISTORY:** *In re Fountain, 2011 Tex. App. LEXIS 3327 (Tex. App. Houston 1st Dist., May 2, 2011)*

**JUDGES:** **[**1]** Panel consists of Justices Keyes, Massengale, and Brown. Justice Keyes, dissenting.

**OPINION BY:** Michael Massengale

**OPINION**

 **[*3] Original Proceeding on Petition for Writ of Habeas Corpus**

In this habeas corpus proceeding, relator Tammy Fountain challenges the legality of her confinement for violating an agreed order in a suit affecting the parent-child relationship.[*] Fountain stipulated that she violated the order, which resulted in findings of contempt and an order committing her to a 60-day jail sentence. The commitment order was suspended, conditioned upon Fountain's continuing compliance with court orders. Acting on a motion to revoke the suspension of commitment, the trial court subsequently found that Fountain had committed further violations of the court's orders, and it ordered that she be taken into custody in accordance with the prior contempt order.

 [*] The underlying case is *In the interest of S.F., a child*, No. 2010-31997 in the 309th District Court of Harris County, Texas, the Honorable Sheri

Dean, presiding.

Finding no abuse of discretion in the trial court's revocation of its prior suspension of commitment, we deny the petition.

**Background**

This is the second time Fountain has sought relief in this court **[**2]** from the proceedings in a suit affecting her parental relationship with her adopted son. *See In re Fountain, No. 01-11-00198-CV, 2011 Tex. App. LEXIS 3327, 2011 WL 1755550 (Tex. App.--Houston [1st Dist.] May 2, 2011, orig. proceeding)* (opinion on rehearing). After we denied mandamus relief from the denial of a motion to dismiss the underlying suit, Fountain agreed to the entry of an order which appointed her as sole managing conservator and Kathy Katcher as a nonparent possessory conservator. Among other things, the October 18, 2011 agreed order provided that within 30 days each party was to "permit the other conservator to obtain health-care information regarding the child" and authorize the disclosure of "protected health information to the other conservator." This order also required each party to notify the "other party, the court, and the state case registry" of any change in the party's contact information, including current residence, phone number, and employer contact information. Fountain and Katcher were also required to provide notification of any intended change in this residency and contact information "on or before the 60th day before the intended change." If a party did not know of the change in **[**3]** time to

provide the 60-day notice, then notice was required "on or before the fifth day after the date that the party knows of the change."

Several months after the entry of the October 18 agreed order, Katcher moved to enforce that order for Fountain's failure to comply. The trial court held two hearings on May 3 and May 11, 2012. The parties stipulated, and the court found, that Fountain violated the October 18 order by failing to execute releases and thereby failing to permit Katcher to obtain health-care information regarding the child, as required by the agreed order. In an order dated May 24, 2012, Fountain was found to be in contempt and ordered to be committed to the Harris County Jail for a period of 60 days as punishment. In the same order, the 60-day jail sentence was suspended on the condition that she comply with the October 18 agreed order and with additional provisions contained in a new modification order which, like the contempt order, was also dated May 24, 2012.

The May 24 modification order required, among other provisions, that Fountain notify the child's schools in writing that Katcher could have lunch with the child at [*4] school, attend school activities, and "receive [**4] all school notices, including all email notices normally sent to parents." Fountain was required to provide this notice to the child's current school by May 15, a date which was four days after the May 11 hearing but nine days before the May 24 order giving rise to this new obligation was actually entered. Additionally, the modification order obligated both parties to exchange a variety of information through an internet application called "Our Family Wizard." The parties were also required to promptly update this data, within 36 hours of any change to any of the initially exchanged data or to other specified scheduling matters, including but not limited to the inability to exercise a period of possession or knowledge that the child would not be attending a previously scheduled extracurricular activity.

Approximately one month later, Katcher moved to revoke the suspension of Fountain's commitment. Katcher alleged multiple violations of the prior orders, three of which are relevant in this proceeding. First, she alleged that Fountain had failed to give her sufficient notice of changes to the child's residence when Fountain notified her of a change of residence to Galveston County effective [**5] three days later. Second, she alleged that Fountain had not timely notified the child's school that Katcher could visit the child for lunch, pick him up from class, and attend school activities. Third, she argued that Fountain had violated the provision of the modification order requiring communication within 36 hours through Our Family Wizard about changes to the scheduled possessory period with the child.

After a hearing, the trial court revoked the suspension of Fountain's commitment in an order dated July 31, 2012. The court found that Fountain had violated the prior orders three times. First, she had failed to "provide the required notice" that she was moving on June 22 when she mailed notice of the move to Katcher on "June 18, 2012." Second, Fountain had failed to inform the school by May 15 that Katcher had permission to access the child there. Third, Fountain had failed to post information to Our Family Wizard as required. The district court ordered that Fountain be committed in accordance with "the orders attached hereto as Exhibits A, B, and C." A copy of the May 24 commitment order was attached as Exhibit A. On its second page, that order provided that "punishment for the [**6] violation set out above is assessed at confinement in the Harris County Jail for a period of sixty (60) days." Fountain was taken into the custody of the jail on the same day.

Fountain filed an original petition for writ of habeas corpus seeking relief in this court, raising five issues. We ordered her released on bond pending our determination of her petition. *See* TEX. R. APP. P. 52.10.

**Analysis**

A final order for possession of or access to a child may be enforced by means of a motion for enforcement as provided by chapter 157 of the Family Code. *TEX. FAM. CODE § 157.001(a)* (West 2008). Such an order may be enforced by contempt, as also provided by chapter 157. *Id. § 157.001(b)*. Chapter 157 specifies particular information that a motion for enforcement must provide "in ordinary and concise language," including identification of "the provision of the order allegedly violated and sought to be enforced," "the manner of the respondent's alleged noncompliance," and "the relief requested by the movant." *Id. § 157.002(a)*. A motion to enforce the terms and conditions of access to a child must also include "the date, place, and, if applicable, the time of [*5] each occasion of the respondent's failure [**7] to comply with the order." *Id. § 157.002(c)*. Chapter 157 sets forth detailed procedures for hearings on enforcement motions.[1]

1 *See* TEX. FAM. CODE ANN. *§§ 157.061-.168.* For example, upon the filing of a motion for enforcement requesting contempt, the trial court shall set the date, time, and place of the hearing and order the respondent to personally appear and respond to the motion. *Id. § 157.061(a).* The respondent is entitled to receive personal service of a copy of the motion and notice not later than the 10th day before the date of the hearing. *Id. § 157.062(c).* If a respondent who has been personally served with notice nevertheless fails to appear at a hearing, the court may not hold the respondent in contempt but may, on proper proof, grant a default judgment for the relief sought and issue a capias for the arrest of the respondent. *Id. § 157.066.*

One potential outcome of a hearing on an enforcement motion requesting contempt findings and sanctions is that the trial court "may place the respondent on community supervision and suspend commitment if the court finds that the respondent is in contempt of court for failure or refusal to obey an order rendered as provided in this title." **[**8]** *Id. § 157.165.* Community supervision under chapter 157 is subject to different procedures from those applicable to enforcement motions. The procedures governing community supervision are detailed in a distinct subchapter. Under that subchapter, a "party affected by the order may file a verified motion alleging specifically that certain conduct of the respondent constitutes a violation of the terms and conditions of community supervision." *Id. § 157.214.* Unlike the procedures generally applicable to a motion to enforce, a prima facie showing of a violation of a condition of community supervision can result in the immediate arrest of the respondent, *id. § 157.215,* followed by a hearing on the motion to revoke community supervision within three days.2 "After the hearing, the court may continue, modify, or revoke the community supervision." *Id. § 157.216(c).*

2 *Compare id. § 157.216(a)* ("The court shall hold a hearing [on motion to revoke community supervision] without a jury not later than the third working day after the date the respondent is arrested under *Section 157.215.*") *with id. § 157.062(c)* ("Notice of hearing on a motion for enforcement of an existing order providing for . . . possession **[**9]** of or access to a child shall be given to the respondent by personal service of a

copy of the motion and notice not later than the 10th day before the date of the hearing.").

In her petition, Fountain alleges numerous deficiencies and errors in the motion and order that revoked the suspension of her commitment to jail. A commitment order is subject to collateral attack in a habeas corpus proceeding. *In re Henry, 154 S.W.3d 594, 596 (Tex. 2005); see* TEX. GOV'T CODE ANN. *§ 22.221(d)* (West 2004) (granting the appellate courts the power to issue writs of habeas corpus). The purpose of the habeas corpus proceeding is not to determine the guilt or innocence of the relator, but only to determine whether she has been unlawfully restrained. *Ex parte Gordon, 584 S.W.2d 686, 688 (Tex. 1979).* We initially presume that the contempt order is valid. *In re Turner, 177 S.W.3d 284, 288 (Tex. App.--Houston [1st Dist.] 2005, orig. proceeding).* But the writ will issue if the trial court's contempt order is beyond the court's power or the court did not afford the relator due process of law. *Id.* (citing *Henry, 154 S.W.3d at 596*).

The relator bears the burden of showing that she is entitled to relief. *Id.* In **[**10]** reviewing the record, we do not weigh the proof; rather, we determine only if the judgment is void because, for example, the relator has been confined without a proper **[*6]** hearing or with no evidence of contempt to support her confinement. *Ex parte Chambers, 898 S.W.2d 257, 260 (Tex. 1995); see* TEX. GOV'T CODE ANN. *§ 22.221(d)* (providing that courts of appeals exercise jurisdiction over habeas corpus petitions "[c]oncurrently with the supreme court").

**I. Punishment**

In her first issue, Fountain argues that the July 31 revocation order was void because it did not clearly state the punishment imposed. She notes that the order, including its three attachments, is 37 pages long, but that the text of the order itself does not specify the length of the jail sentence or identify which attachment contains the sentence. Fountain does acknowledge, however, that the May 24 contempt order was attached to the July 31 revocation order and specified a 60-day jail sentence.

Fountain relies upon *Family Code section 157.166(a)(4)* for the proposition that "an enforcement order must include 'the relief granted by the court.'" This provision is contained within subchapter D of chapter 157 relating generally to **[**11]** enforcement hearings and orders in suits affecting the parent-child relationship. *See*

*TEX. FAM. CODE* § *157.001(a)* ("A motion for enforcement as provided in this chapter may be filed to enforce a final order for conservatorship, child support, possession of or access to a child, or other provisions of a final order."). *Section 157.166* does specify certain contents which must be included in an enforcement order, including "the relief granted by the court." *See id.* § *157.166(a)(4)*. But the provision is not part of subchapter E, which relates specifically to community supervision, including proceedings to revoke community supervision. *See id.* §§ *157.211-.217*.

Although Fountain's legal challenges are directed at the July 31 revocation order, the actual enforcement order at issue in this proceeding is the May 24 contempt order. Fountain does not complain that this order failed to identify "the relief granted by the court"--indeed, she concedes that it did. Her complaint, instead, is that the relief was not expressly stated in the July 31 revocation order, and that referencing the May 24 contempt order and attaching it to the July 31 revocation order was the equivalent of not including it at **[**12]** all. As characterized by Fountain, "[h]iding this requirement [of a statement of 'the relief granted by the court'] is the equivalent of not including it."

We disagree with the suggestion that the statement of the relief granted by the court was "hidden" in any relevant sense. Fountain relies on *In re Levingston, 996 S.W.2d 936, 938 (Tex. App.--Houston [14th Dist.] 1999, no pet.)*, and *Ex parte Waldrep, 783 S.W.2d 332, 333 (Tex. App.--Houston [14th Dist.] 1990, orig. proceeding)*, for the proposition that "the purpose of the commitment order is to notify the offender of how she has violated its provisions, to notify the sheriff so that he can carry out enforcement, and to provide sufficient information for an adequate review." We do not question this principle. *See, e.g., In re Luebe, No. 01-09-00908-CV, 404 S.W.3d 589, 2010 Tex. App. LEXIS 2597, 2010 WL 1546961 (Tex. App.--Houston [1st Dist.] Apr. 2, 2010, no pet.)*; *Turner, 177 S.W.3d at 289*. However, Fountain provides no argument about how she lacked adequate notice of the sentence, what information is missing for law enforcement purposes, or how our review has been impaired. To the contrary, the record is clear that Fountain was sentenced to a 60-day jail sentence in the May 24 **[**13]** contempt order, that the sentence was suspended on the condition of her future compliance with the court's orders, and that on July 31 the trial court found that such orders had been violated and accordingly **[*7]**

revoked the suspension of the previously entered 60-day sentence.

The May 24 contempt order provided on its second page that "punishment for the violation set out above is assessed at confinement in the Harris County Jail for a period of sixty (60) days." This clearly stated the punishment imposed, contrary to Fountain's assertion that it was hidden. "There is no particular form required of either the order of contempt or the commitment order, provided that their essential elements appear in a written document." *Ex parte Snow, 677 S.W.2d 147, 149 (Tex. App.--Houston [1st Dist.] 1984, no writ)*. We overrule Fountain's first issue.

## II. Grounds for revocation of suspension

In her four remaining issues, Fountain argues that Katcher's motion for revocation and the trial court's July 31 revocation order fail to satisfy the procedural standards of Family Code chapter 157 in several respects. In her second issue, she argues that the judgment of contempt cannot be enforced based on violations **[**14]** of the May 24 modification order because the conditions of suspension in the May 24 contempt order mistakenly reference the "Modification Order of May 25, 2012." In her third issue, she argues that although Katcher's motion to revoke alleged that she violated the October 18 agreed order by mailing a notice on June 19, 2012, the trial court found that the violation was committed on June 18, 2012, and therefore is "not supported by the pleadings." The fourth issue relates to the requirement in the May 24 contempt order that certain information be provided by May 15--before that order was actually entered. And the fifth issue complains of the specificity of the motion to revoke and the revocation order with respect to the allegation and finding that Fountain interfered with Katcher's participation in school lunches by failing to timely share information about the child's schedule on Our Family Wizard in violation of the court's orders.

One misconception underlies each of these issues in common. Fountain wrongly assumes that Katcher's motion to revoke and the trial court's revocation order must satisfy all of the procedural safeguards for an enforcement motion under subchapter D of chapter **[**15]** 157, as if a separate allegation, finding, and sentence for contempt of court were at issue. In other cases, these safeguards in fact have been applied under circumstances when a party has been found in contempt and sentenced, the commitment has been suspended

subject to compliance with specified conditions, and then in further proceedings to revoke the suspension of commitment, a trial court made additional findings of contempt and imposed a different punishment. In such circumstances, with new allegations of contempt and enhanced sanctions, the motion to revoke does not merely invoke a previously rendered judgment of contempt, but the new motion instead functions as a separate enforcement motion for purposes of chapter 157. *See, e.g., In re Broussard, 112 S.W.3d 827, 831 (Tex. App.--Houston [14th Dist.] 2003, no pet.)*; *Ex parte Bagwell, 754 S.W.2d 490, 493 (Tex. App.--Houston [14th Dist.] 1988, no writ)*; *Ex parte Durham, 708 S.W.2d 536, 537 (Tex. App.--Dallas 1986, no writ)*.

In this case, however, although Katcher alleged and the trial court found that Fountain had violated the conditions of the suspension of her commitment, Katcher did not request and the trial court did not enter additional **[**16]** findings of contempt. Instead, as anticipated by chapter 157 and particularly subchapter E pertaining to community supervision, the trial court merely enforced the provisions of its own suspended commitment order, and it revoked **[*8]** the suspension, resulting in the imposition of the original sentence imposed for the original, admitted episodes of contempt.

Fountain provides no argument or authority for us to apply subchapter D of chapter 157 and its detailed procedures applicable to an original enforcement hearing to the separate circumstance of a proceeding merely to determine whether to revoke the suspension of a valid prior order of commitment for contempt, and we decline to do so. That approach would render ineffective the common practice of suspending contempt judgments contingent upon future compliance with court order. There is no reason to deprive trial courts of such flexibility in the enforcement of their orders. A heightened procedural standard is justified for contempt proceedings in the first instance, especially when incarceration of the respondent is a potential result. But once there has been a judgment of contempt, there is no requirement that the same heightened measure **[**17]** of process be provided in order to adjudicate an allegation that the conditions of a suspended judgment have been violated. Instead, like the analogous circumstance of an appeal from the revocation of probation in a criminal proceeding, we review the trial court's ruling for an abuse of discretion. *See, e.g., Bryant v. State, No. PD-0049-12, 391 S.W.3d 86, 2012 Tex. Crim. App. LEXIS 1383, 2012*

*WL 5232147 (Tex. Crim. App. Oct. 24, 2012)*; *see also In re Butler, 45 S.W.3d 268, 272 (Tex. App.--Houston [1st Dist.] 2001, no pet.)* ("Proceedings in contempt cases should conform as nearly as practicable to those in criminal cases."). In the case of an order revoking community supervision, proof of any one violation of the conditions of suspension is sufficient to support the revocation order. *See In re Bourg, No. 01-07-00623-CV, 2007 Tex. App. LEXIS 6977, 2007 WL 2446844 (Tex. App.--Houston [1st Dist.] Aug. 27, 2007, no pet.)* (holding proof of any one violation of an order revoking suspension of commitment for contempt is sufficient to support revocation); *In re B.C.C., 187 S.W.3d 721, 724 (Tex. App.--Tyler 2006, no pet.)*.

Accordingly, we must deny relief if the revocation was justified on any basis, and in this case it was. After Fountain received notice of Katcher's **[**18]** motion to revoke and a hearing was held, the trial court found three violations of Fountain's conditions of suspension of commitment. One of the violations related to Fountain's failure to comply with the trial court's order with respect to timely informing Katcher of a planned change of residential address. The October 18 agreed order provided, in relevant part:

> *Required Notices*
>
> EACH PERSON WHO IS A PARTY TO THIS ORDER IS ORDERED TO NOTIFY EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY OF ANY CHANGE IN THE PARTY'S CURRENT RESIDENCE ADDRESS . . . . THE PARTY IS ORDERED TO GIVE NOTICE OF AN INTENDED CHANGE IN ANY OF THE REQUIRED INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY ON OR BEFORE THE 60TH DAY BEFORE THE INTENDED CHANGE. IF THE PARTY DOES NOT KNOW OR COULD NOT HAVE KNOWN OF THE CHANGE IN SUFFICIENT TIME TO PROVIDE 60-DAY NOTICE, THE PARTY IS ORDERED TO GIVE NOTICE OF THE CHANGE ON OR BEFORE THE FIFTH DAY AFTER THE DATE THAT PARTY KNOWS OF THE

CHANGE.

THE DUTY TO FURNISH THIS INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE **[*9]** STATE CASE REGISTRY CONTINUES AS LONG AS ANY PERSON, BY VIRTUE OF THIS ORDER, IS UNDER AN OBLIGATION TO PAY CHILD SUPPORT **[**19]** OR ENTITLED TO POSSESSION OF OR ACCESS TO A CHILD.

FAILURE BY A PARTY TO OBEY THE ORDER OF THIS COURT TO PROVIDE EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY WITH THE CHANGE IN THE REQUIRED INFORMATION MAY RESULT IN FURTHER LITIGATION TO ENFORCE THE ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR UP TO SIX MONTHS, A FINE OF UP TO $500 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

Notice shall be given to the other party by delivering a copy of the notice to the party by registered or certified mail, return receipt requested. . . .

In the July 31 revocation order, the trial court specifically found that Fountain had violated this provision by failing to provide Katcher the "required notice" of her plan to move to Galveston County. This finding was supported by circumstantial evidence presented at the evidentiary hearing on the motion to revoke. On June 18, 2012, Fountain sent a letter to Katcher, informing her of a change of residential address. Fountain would have violated the agreed order's "Required Notices" provision if she knew of "an intended change" of residential address **[**20]** before June 13, or more than five days before she actually provided notice of the move to Katcher.

Fountain testified that she knew a move was possible as of June 14, but she did not know until June 16 that the move would actually occur. Other evidence at the hearing cast serious doubts on that testimony. The child spent the weekend of June 15-17 with Katcher. During that weekend, the child told Katcher that he had a "condo in Galveston" with his own bathroom, that it had a pool where he had been swimming, and that he been to his new school. Fountain admitted that the child had learned all of this information prior to June 15. Additionally, on June 16 Fountain leased her Houston home to an acquaintance. Nevertheless, Fountain insisted that she did not know about the intended move until June 16.

The burden of proof to justify the revocation of a suspension of commitment is a preponderance of the evidence, meaning that greater weight of the credible evidence which would create a reasonable belief that the respondent violated a condition of the suspension of commitment. *Cf. Rickels v. State, 202 S.W.3d 759, 763-64 (Tex. Crim. App. 2006)* (describing burden of proof to revoke probation). **[**21]** We review the evidence in the light most favorable to the trial court's judgment. *See Canseco v. State, 199 S.W.3d 437, 439 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd).* "The trial court is the exclusive judge of the credibility of the witnesses and must determine whether the allegations in the motion to revoke are sufficiently demonstrated." *Id.*

As the exclusive judge of the credibility of the witnesses, the trial court obviously did not believe Fountain's testimony that she did not know of an intended change of residential address prior to June 14. The circumstantial evidence relating to the move, including the child's knowledge of details about the new residence and the arrangement of a tenant to lease Fountain's **[*10]** Houston home, supported a reasonable belief that Fountain violated the agreed order's requirement that she notify Katcher on or before the fifth day after she knew of the intended change.

Fountain also contends that Katcher's motion to revoke failed to provide her sufficient notification of this alleged violation due to a variance in the date of her written notice as specified in the motion (June 19) and the date identified in the revocation order (June 18). This defect **[**22]** does not invalidate the revocation order. "It is well settled that allegations in a revocation motion need not be made with the same particularity of an indictment although such allegations must be specific

enough to give the accused notice of alleged violation of law contrary to conditions of probation." *Chacon v. State, 558 S.W.2d 874, 876 (Tex. Crim. App. 1977)* (quoted with approval in *In re Zandi, 270 S.W.3d 76, 77 (Tex. 2008)* (per curiam)). The motion to revoke adequately notified Fountain of the essential allegations against her, relating to the timing of her written notice of the move to Galveston. Her letter was dated June 16 but was actually mailed on June 18. The motion to revoke's reference to the notice being mailed on June 19 did not deprive Fountain of notice of the essential allegation about her violation of the requirement of written notice.

Accordingly, we overrule Fountain's third issue challenging the adequacy of the motion to revoke to provide her notice of the allegation that she violated the agreed order by providing untimely notice of an intended move. Because at least one of the grounds for revocation was supported by the evidence, we need not address Fountain's **[**23]** remaining issues challenging the other two violations found by the trial court.

**Conclusion**

We conclude that Fountain has not shown that she was illegally restrained by the trial court's order revoking suspension of commitment and committing her to county jail. We therefore deny Fountain's request for habeas corpus relief.

Michael Massengale

Justice

**DISSENT BY:** Evelyn V. Keyes

**DISSENT**

**DISSENTING OPINION**

I respectfully dissent. I deeply disagree with the majority's characterization of the issues in this case, its legal conclusions, and its disposition of this habeas corpus proceeding.

The trial court found Tammy Fountain in contempt for violating a court order in a suit affecting the parent-child relationship, sentenced her to jail, and, in the same order, suspended her commitment.[1] The court subsequently revoked its earlier suspension order and committed Fountain to jail. In five issues, she contends

that the commitment order is void and violates her constitutional due process rights. The majority first addresses the trial court's order committing Fountain to jail and reaches its conclusion that she be returned to jail. It fails to identify or address any of the five issues raised by Fountain until page eight **[**24]** of its opinion, swiftly disposes of the first issue, and then lumps her other four issues together and disposes of those by holding that the statutory and constitutional procedural safeguards that apply to contempt proceedings do not apply to orders revoking the suspension of commitment.

1  The underlying case is *In the interest of S.F., a child*, No. 2010-31997, in the 309th District Court of Harris County, Texas, the Honorable Sheri Y. Dean, presiding.

I agree with Fountain that the commitment order is void under established Texas **[*11]** law and that, therefore, her commitment to jail violates her constitutional right to due process of law. In its contempt order committing Fountain to jail, the trial court failed to specify the manner in which Fountain had committed two of the three violations for which it found her in contempt. For the remaining violation, the trial court found Fountain in contempt for acts that occurred before the court signed the order giving rise to Fountain's obligation. The commitment order is, therefore, void. I would hold that the trial court abused its discretion in revoking its order suspending Fountain's commitment. I would grant the petition for writ of habeas corpus, **[**25]** and I would order Fountain discharged.

**Background**

On October 18, 2011, the trial court signed an order in which Tammy Fountain and Katherine Katcher agreed to their various rights and duties as conservators of a child. Among its numerous provisions, this order provided that, within thirty days after the signing of the order, each party was to "permit the other conservator to obtain health-care information regarding the child" and to authorize the disclosure of "protected health information to the other conservator" pursuant to federal health care law. The order also required each party to notify the "other party, the court, and the state case registry of any change in the party's current residence," phone number, employer contact information, and other similar information. The party was required to provide notification of any intended change in this residency and contact information "on or before the 60th day before the

intended change." If the party did not know of the intended change in enough time to provide the sixty-day notice, then the party was required to give notice "on or before the fifth day after the date that the party knows of the change."

Several months later, on May 24, **[\*\*26]** 2012, the trial court entered an order of contempt against Fountain because the court found that she had violated the earlier October 18, 2011 order by failing to execute the required releases to allow Katcher to obtain the child's health-care information. Accordingly, the trial court ordered Fountain committed to Harris County Jail for sixty days. But in the same order, the court suspended Fountain's commitment so long as she complied "with each and every provision of the Agreed Order of October 18, 2011, and of the Modification Order of May 25, 2012." To accompany this order, the trial court prepared a modification order, which imposed new duties and obligations on Fountain. The hearing on these orders was held on May 11, 2012, but the orders were not signed and filed until May 24, 2012, thirteen days later.

The May 24, 2012 modification order, among other provisions, required that Fountain notify the child's school, in writing with notice to the court, that Katcher could have lunch with the child at school, pick the child up from school, attend school activities, and receive all school notices. Fountain was required to notify the child's current school by May 15, 2012, four days **[\*\*27]** after the hearing on the new order, but nine days before the trial court signed the new order giving rise to this obligation. Additionally, the May 24, 2012 modification order obligated both parties to exchange contact information and schooling information and, within thirty-six hours of a change, to post any changes to periods for possession of the child through an Internet program called "Our Family Wizard."

A month later, Katcher moved to revoke the suspension of Fountain's commitment. She accused Fountain of four violations of the prior orders. First, she alleged that **[\*12]** Fountain had failed to provide the required notice of changes to the child's residence when Fountain had notified her only on June 19, 2012, that Fountain and the child would be moving to Galveston County three days later. Second, she alleged that Fountain had not notified the child's school by May 15, 2012, that Katcher could visit the child for lunch, pick him up from class, attend school activities, and receive

school notices. Third, Katcher alleged that Fountain had violated the provision of the May 24, 2012 modification order requiring communication within thirty-six hours through the Our Family Wizard website **[\*\*28]** about changes to the scheduled possessory period with the child. Fountain had allegedly told Katcher that the child would not be available for Katcher's scheduled lunch visit on June 6, 2012, because the child would be absent from school all week, but she then told Katcher on June 8, 2012, that the child had only been absent on the day scheduled for Katcher's visit. Fourth, Katcher accused Fountain of not paying a $77 court cost.

On July 31, 2012, after a hearing, the trial court revoked the suspension of Fountain's commitment ("the commitment order"). Using substantially the same wording as found in Katcher's motion to revoke, the court found that Fountain had violated its prior orders three times. First, she failed to "provide the required notice" that she was moving on June 22, 2012, when she mailed notice of the move to Katcher on June 18, 2012. Second, Fountain failed to inform the child's current school by May 15, 2012, that Katcher had permission to access the child there. Third, Fountain failed to post information to Our Family Wizard as required when she had told Katcher that the child was unavailable for lunch with Katcher on June 6, 2012. The district court ordered that Fountain **[\*\*29]** be committed in accordance with "the orders attached hereto as Exhibits A, B, and C." A copy of the original May 24, 2012 contempt order hand-labeled with an "A" followed the revocation order. On its second page, the attached contempt order provided that "punishment for the violation set out above is assessed at confinement in the Harris County Jail for a period of sixty (60) days."

Fountain filed an original petition for writ of habeas corpus seeking relief in this Court, raising five issues. We ordered her released on bond pending our determination of her request for relief.

## Contempt and Commitment Orders

"Criminal contempt is punishment for past disobedience to a court order that constitutes an affront to the dignity and authority of the court." *In re Houston, 92 S.W.3d 870, 876 n.2 (Tex. App.--Houston [14th Dist.] 2002, orig. proceeding).* Civil contempt is remedial and coercive; release may be procured by compliance with the provisions of the court's order. *Id.* "Civil contempt proceedings are quasi-criminal in nature, and the

contemnor is entitled to procedural due process throughout the proceedings." *Id. at 876*. Among the due process rights accorded is the right to reasonable notice **[**30]** of each allegedly contumacious act. *Id*. Due process requires "full and complete notification" of the charges with a reasonable opportunity to meet them by defense or explanation. *Id*. In addition, criminal contempt requires proof beyond a reasonable doubt. *Id*.; *see Ex parte Chambers, 898 S.W.2d 257, 259 (Tex. 1995)*. In order to support a judgment of contempt, the underlying decree must set forth the terms of compliance in "clear, specific and unambiguous terms" so that the person charged with obeying the order will know exactly what duties and obligations are imposed on her. *Chambers, 898 S.W.2d at 260*; *Houston, 92 S.W.3d at 877*. The order of contempt may not be susceptible to more than one **[*13]** interpretation. *Houston, 92 S.W.3d at 877*.

"Due process requires a court, before imprisoning a person for violating an earlier order, to sign a written judgment or order of contempt and a written commitment order." *Ex parte Shaklee, 939 S.W.2d 144, 145 (Tex. 1997)* (per curiam) (citing *Ex parte Barnett, 600 S.W.2d 252, 256 (Tex. 1980))*. The contempt order must clearly state in what respect the court's earlier order has been violated. *Id*.; *see also Ex parte Edgerly, 441 S.W.2d 514, 516 (Tex. 1969)* (order **[**31]** or other means of notification "must state when, how, and by what means the defendant has been guilty of the alleged contempt"). Complementing this due process requirement, the Texas Family Code mandates that motions for enforcement and orders confining someone for violating a court's enforcement order must state "the manner of the respondent's noncompliance." *TEX. FAM. CODE ANN. §§ 157.002(a)(2)*, *157.166(a)(3)* (Vernon 2008). Further, an order imposing incarceration for criminal contempt must contain findings identifying "the date of each occasion when the respondent's failure to comply with the order was found to constitute criminal contempt."[2] *Id. § 157.166(b)*.

2 *Family Code section 157.166* provides:

(a) An enforcement order must include:

(1) in ordinary and concise language the provisions of the

order for which enforcement was requested;

(2) the acts or omissions that are the subject of the order;

(3) the manner of the respondent's noncompliance; and

(4) the relief granted by the court.

(b) If the order imposes incarceration or a fine for criminal contempt, an enforcement order must contain findings identifying, setting out, or incorporating by reference the provisions of the order for **[**32]** which enforcement was requested and the date of each occasion when the respondent's failure to comply with the order was found to constitute criminal contempt.

(c) If the enforcement order imposes incarceration for civil contempt, the order must state the specific conditions on which the respondent may be released from confinement.

*TEX. FAM. CODE ANN. § 157.166* (Vernon 2008).

**Standard of Review of Commitment Order**

A commitment order is subject to collateral attack in a habeas corpus proceeding. *In re Henry, 154 S.W.3d 594, 596 (Tex. 2005)* (per curiam); *see TEX. GOV'T CODE ANN. § 22.221(d)* (granting appellate courts power to issue writs of habeas corpus). The purpose of the habeas corpus proceeding is not to determine the guilt or innocence of the relator; rather, the purpose is only to determine whether she has been unlawfully restrained. *Ex parte Gordon, 584 S.W.2d 686, 688 (Tex. 1979)*. We

presume that the contempt order is valid. *In re Turner, 177 S.W.3d 284, 288 (Tex. App.--Houston [1st Dist.] 2005, orig. proceeding)*. But we will issue the writ if the trial court's contempt order is void because it is beyond the court's power or the court did not afford the relator due process of law. **[**33]** *Id.* (citing *Henry, 154 S.W.3d at 596*).

The relator bears the burden of showing that she is entitled to relief. *Id.* In reviewing the record, we do not weigh the proof; rather, we determine only if the contempt order is void because, for example, the relator has been confined without a proper hearing or with no evidence of contempt to support her confinement. *Chambers, 898 S.W.2d at 259-60*.

**Validity of Commitment Order**

Here, the trial court's order committed Fountain to jail as punishment for past violations of the court's May 24, 2012 contempt order. Therefore, the commitment **[*14]** order is an order of criminal contempt. *See Houston, 92 S.W.3d at 876 n.2*.

In her petition, Fountain points out numerous deficiencies and errors in the revocation motion and order that committed her to jail for contempt. She argues that two of the contempt violations are improper because the commitment order does not state the manner in which she failed to comply with the prior court orders, as required by due process and the Texas Family Code. *See TEX. FAM. CODE ANN. § 157.166(a)(3)*; *Shaklee, 939 S.W.2d at 145* ("The contempt order must clearly state in what respect the court's earlier order has been violated.") (citation **[**34]** omitted). Fountain argues that the remaining contempt violation is improper because the trial court found that she violated a provision in the court's order that required compliance before the court even signed the order imposing that particular obligation. *See Chambers, 898 S.W.2d at 262* (contemnor cannot be held in contempt of court for actions that predate when court's order is reduced to writing).

Because I find these arguments dispositive in determining that the commitment order is void, I would not reach Fountain's other issues.

*I. Deficiencies in the Revocation Motion and Order*

While the commitment order states that Fountain failed to comply with several provisions of prior court orders, the order does not state the *manner* of her noncompliance. The order states:

> **Violation 1**. On June 18, 2012, respondent mailed to movant a notice that as of June 22, 2012, her residence and that of the child was changed to an address in Galveston County. This does not provide the required notice.

This violation was accompanied by a copy of the text of the October 18, 2011 agreed order that required the parties to inform each other of changes to the child's current address within sixty days or within **[**35]** five days of learning of a change of address if the party did not know of the change in enough time to meet the sixty-day requirement. For the other violation, the order states:

> **Violation 4**. Respondent has interfered with movant's lunches with the child at school by violation of the order concerning posting information on Our Family Wizard. Movant had scheduled lunch with the child at school for June 6, 2012; respondent notified movant that the child would not be at school all that week. Respondent changed this schedule, and notified movant -- at lunch time on June 8, 2012 -- that in fact he **had been** at school all that week, except for the Wednesday movant had scheduled. Respondent failed to post this change timely, presumably to prevent movant's being able to reschedule and have lunch with the child a different day of the week.

This language is quoted verbatim from Katcher's motion to revoke. Preceding the violation, the court's May 24, 2012 modification order is quoted, which required that each party promptly post:

> b. knowledge that a child will not be attending a previously scheduled extracurricular activity -- immediately, or as soon as practicable under the circumstances; but no less **[**36]** than eight hours; . . .

> f. any other changes -- within thirty-six hours of the change.

These findings do not state the manner of Fountain's noncompliance. In the first violation, stating that Fountain had failed to report that she was moving with the child to Galveston County, the findings do not mention how Fountain failed to notify Katcher. Did the court find that Fountain **[\*15]** had known when she was moving earlier, and so it found that she had failed to notify Katcher within the five-day time limit imposed by the October 18, 2011 order? Or did the court find that Fountain had known she was planning to move much earlier, and thus she failed to notify Katcher sixty days before the move as the October 18, 2011 order required?

In the other violation, noting that Fountain had failed to update the Our Family Wizard program on the week Katcher attempted to visit the child at lunch, the findings again fail to state *how* Fountain had violated the May 24, 2012 modification order. Did she violate the modification order when she reported to Katcher that the child would be gone from school all week but then two days later reported he had been in school some days that week? The earlier order did not require **[\*\*37]** her never to change the child's itinerary, only to report changes to the Family Wizard program. So, did Fountain fail to update the program at all? Or did she fail to update the program within the thirty-six hour time limit? For both violations, on what date did Fountain fail to comply with the previous orders? *See id.* (requiring order to identify date of each violation found to constitute contempt). The face of the commitment order does not answer these questions.

The commitment order is insufficient because these findings of violations of prior orders are unclear. *See Houston, 92 S.W.3d at 877*. The contempt order must spell out exactly what duties and obligations are imposed and what the contemnor can do to purge the contempt. *Id.* (citing *Ex parte Proctor, 398 S.W.2d 917, 918 (Tex. 1966))*. Generally, in the contempt context, the order or motion must be clear and unambiguous, which means the order or motion must be capable of only one reasonable interpretation. *Chambers, 898 S.W.2d at 260*. Although the revocation motion and the subsequent commitment order listed dates and described Fountain's actions, these documents are amenable to multiple reasonable interpretations as to how or **[\*\*38]** even whether Fountain had violated the earlier orders. *See id.* ("A court order is insufficient to support a judgment of contempt only if its interpretation requires inferences or conclusions about which *reasonable* persons might

differ.") (emphasis in original) (citing *Ex parte MacCallum, 807 S.W.2d 729, 730 (Tex. 1991))*. This is fatal to the commitment order because Fountain lacked the requisite notification of how to purge her contempt and how she might avoid violating court orders in the future. *See Shaklee, 939 S.W.2d at 145* (invalidating contempt order for failing to specify when contemnor violated earlier orders); *Ex parte Blasingame, 748 S.W.2d 444, 446-47 (Tex. 1988)* (invalidating contempt order punishing couple for taking action that they reasonably interpreted as not violating prior orders).

The majority states that Fountain "wrongly assumes that Katcher's motion to revoke and the trial court's revocation order must satisfy all of the procedural safeguards for an enforcement motion under [Family Code] chapter 157, as if a separate allegation, finding, and sentence for contempt of court were at issue." Slip Op. at 12. The majority then cites several cases for the proposition **[\*\*39]** that a motion to revoke the suspension of commitment actually "functions as a separate enforcement motion," and is therefore subject to chapter 157's procedural requirements, including *section 157.166*'s requirement that the contempt order specifically state the manner of the contemnor's noncompliance with a previous court order, when the trial court, in a revocation proceeding, makes additional contempt findings and imposes a different punishment. Slip Op. at 12-13. **[\*16]** The majority concludes that these cases are distinguishable and that chapter 157's procedural requirements are inapplicable, because, here, when the trial court revoked the suspension of Fountain's commitment it "did not enter additional findings of contempt," but instead it imposed the "original sentence" for the "original, admitted episodes of contempt." Slip Op. at 13.

The majority justifies its holding by stating,

In other cases, these [procedural] safeguards in fact have been applied under circumstances when a party has been found in contempt and sentenced, the commitment has been suspended subject to compliance with specified conditions, and then in further proceedings to revoke the suspension of commitment a trial **[\*\*40]** court made additional findings of contempt and imposed a different punishment. In such circumstances, with

new allegations of contempt and enhanced sanctions, the motion to revoke does not merely invoke a previously rendered judgment of contempt, but the new motion instead functions as a separate enforcement motion for purposes of chapter 157.

Slip Op. at 12. The majority reasons that because Katcher "did not request and the trial court did not enter additional findings of contempt," but "merely enforced the provisions of its own suspended commitment order," "subchapter D of chapter 157 and its detailed procedures applicable to an original enforcement hearing" do not apply. Slip op. at 13. The majority cites no authority for its holding. Rather, it refuses to follow established authority on allegedly distinguishable factual grounds. I, therefore, take the majority to be making its own law without authority and in conflict with established law.

I **[\*\*41]** disagree that the procedural safeguards applicable to enforcement motions and orders are not applicable here. And I disagree that there are material factual distinctions between this case and the prior cases in which the law has been established.

The original May 24, 2012 contempt order found Fountain in contempt for violating the provision of the October 18, 2011 agreed order requiring her to execute all necessary releases to permit Katcher to obtain health-care information concerning the child. The court ordered Fountain confined for sixty days in the Harris County Jail and ordered her to pay $5,000 to Katcher in attorney's fees, but the court then suspended the commitment pursuant to Fountain's compliance with the October 18, 2011 agreed order and the May 24, 2012 modification order. In the commitment order, which revoked the suspension of Fountain's commitment, the court ordered that Fountain be confined for sixty days in the Harris County Jail, that Fountain pay $5,000 to Katcher, as ordered in the May 24, 2012 contempt order, and that Fountain pay, "in addition to the attorney's fees and costs assessed in the order suspending commitment signed on May 24, 2012," an additional $4,379 **[\*\*42]** in attorney's fees and costs to Katcher's attorney.

The court also found that Fountain violated the October 18, 2011 agreed order by not "provid[ing] the required notice" that she and the child were moving to Galveston County and the May 24, 2012 modification

order by failing to notify the child's school of Katcher's access and by failing to timely update Our Family Wizard. The commitment order thus identified additional violations of ongoing obligations without specifying how Fountain failed to comply with these obligations and imposed a greater punishment than the original contempt order. *See Houston, 92 S.W.3d at* **[\*17]** *877* (contempt order must spell out duties and obligations imposed and what contemnor can do to purge contempt). Thus, the commitment order was not clear and unambiguous, as required for a holding of contempt. *See Chambers, 898 S.W.2d at 260.*

I would conclude that the commitment order is functionally equivalent to an original enforcement order, and, therefore, Family Code chapter 157's procedural safeguards, including *section 157.166(a)*'s requirement that the enforcement order state the manner of the contemnor's noncompliance, apply equally to this proceeding. *See Ex parte Durham, 708 S.W.2d 536, 537-38 (Tex. App.--Dallas 1986, orig. proceeding)* **[\*\*43]** ("The purpose of this commitment order is to enforce the punishment provisions imposed by the original order holding relator in contempt. Consequently, we hold that this commitment order is an 'enforcement order' under [the predecessor to *section 157.166*]."); *see also Houston, 92 S.W.3d at 876* (holding that civil contempt proceedings are quasi-criminal, entitling contemnor to procedural due process "throughout the proceedings"). I would hold that procedural statutory and constitutional due process safeguards were violated in this case. *See TEX. FAM. CODE ANN. § 157.166(a)(3); Shaklee, 939 S.W.2d at 145; Houston, 92 S.W.3d at 875-77.* Therefore, the commitment order is void. *See Houston, 92 S.W.3d at 875-77.*

## II. Confinement for Violating Court's Command Before Court Issued Order Imposing Obligation

Even if the trial court had clearly stated the manner of Fountain's noncompliance in the commitment order, the order would still be void for finding Fountain in contempt of court for violating the court's May 24, 2012 order on a date predating the date on which the court actually signed that order. *See Chambers, 898 S.W.2d at 262* ("A contemnor cannot be held in constructive contempt of court **[\*\*44]** for actions taken prior to the time that the court's order is reduced to writing."). It is the written order, signed by the court, that evinces a party's rights and duties, not oral admonitions at the

hearing. *In re Sellers, 982 S.W.2d 85, 87 (Tex. App.--Houston [1st Dist.] 1998, orig. proceeding)* (citing *Ex parte Price, 741 S.W.2d 366, 367 (Tex. 1987))*.

The second violation in the contempt order was for Fountain's failure to inform the child's school about Katcher's rights of access to the child by May 15, 2012. The underlying order giving rise to this obligation, however, was signed on May 24, 2012, nine days after the date on which Fountain allegedly violated the order. Under Texas law, this invalidates the commitment order. *See Chambers, 898 S.W.2d at 262*; *Sellers, 982 S.W.2d at 87*; *see also Dunn v. Street, 938 S.W.2d 33, 35 n.3 (Tex. 1997)* (per curiam) (voiding contempt judgment because contemnor "did not violate a written order of the trial court").

The trial court assessed a punishment of sixty days' confinement and required the payment of attorney's fees for all of the contumacious acts it found. This means that even if only one of the violation findings was invalid, the entire **[**45]** order would be void.[3] *Ex parte Davila, 718 S.W.2d 281, 282 (Tex. 1986)* (per curiam) ("If one punishment is assessed for multiple acts of contempt, and one of those acts is not punishable by contempt, the entire judgment is void"); *Ex parte Sealy, 870 S.W.2d 663, 667 (Tex. App.--Houston [1st Dist.] 1994, orig. proceeding)*

(holding same). **[*18]** The commitment of a person to jail on a void order violates constitutional due process. *See Gordon, 584 S.W.2d at 688* ("Where the judgment ordering confinement is 'void,' the confinement is illegal and the relator is entitled to discharge."); *In re Alexander, 243 S.W.3d 822, 827 (Tex. App.--San Antonio 2007, orig. proceeding)* ("A writ of habeas corpus will issue when the relator has not been afforded due process, or when the order requiring confinement is void.").

> 3   Because none of the three acts in the commitment order will support a finding of contempt, I would not reach Fountain's other issues.

**Conclusion**

I would hold that the trial court abused its discretion in revoking its order suspending Fountain's commitment to jail and that the commitment order is void. Accordingly, I would grant the petition for writ of habeas corpus, and I would order Fountain **[**46]** released from her bond and discharged.

Evelyn V. Keyes

Justice



**IN THE INTEREST OF A.C.F.H., and D.A.B.H., Children**

**No. 04-11-00322-CV**

**COURT OF APPEALS OF TEXAS, FOURTH DISTRICT, SAN ANTONIO**

*373 S.W.3d 148*; *2012 Tex. App. LEXIS 1769*

**March 7, 2012, Delivered**
**March 7, 2012, Filed**

**SUBSEQUENT HISTORY:** Released for Publication July 19, 2012.

**PRIOR HISTORY: [**1]**
   From the 150th Judicial District Court, Bexar County, Texas. Trial Court No. 2009-CI-06175. Honorable Barbara Hanson Nellermoe, Judge Presiding.
*In the Interest of A.C.F.H., 2011 Tex. App. LEXIS 5504 (Tex. App. San Antonio, July 20, 2011)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For APPELLANT: Cristina T. De Leon, Law Offices of Cristina T. De Leon, San Antonio, TX.

For APPELLEE: Gilbert Vara, Jr., The Law Office of Gilbert Vara, Jr., San Antonio, TX; Ryan C. Moe, The Law Office of Ryan C. Moe, P.L.L.C., San Antonio, TX.

**JUDGES:** Opinion by: Sandee Bryan Marion, Justice. Sitting: Catherine Stone, Chief Justice, Sandee Bryan Marion, Justice, Steven C. Hilbig, Justice.

**OPINION BY:** Sandee Bryan Marion

**OPINION**

   **[*149]** AFFIRMED

   This is an appeal from an April 7, 2011 Nunc Pro Tunc Order in Suit Affecting Parent-Child Relationship. The order was entered after the parties entered into a Mediated Settlement Agreement. The appellant, "Margaret," is the biological mother of the two children who are the subject of the order. Appellee, "Michael," is the step-father of both children. In the order, the trial court appointed Michael and Margaret as joint managing conservators of the children. In a single issue on appeal, Margaret asserts the trial court lacked subject-matter jurisdiction to enter **[*150]** the order because Michael lacked standing to file an original suit **[**2]** affecting the parent-child relationship. We disagree and affirm.

**ANALYSIS**

   Although Margaret did not challenge Michael's standing before the trial court, standing is implicit in the concept of subject-matter jurisdiction and, therefore, is a threshold issue that we may address for the first time on appeal. *In re Vogel, 261 S.W.3d 917, 920 (Tex. App.--Houston [14th Dist.] 2008, orig. proceeding)*; *In re SSJ-J, 153 S.W.3d 132, 134 (Tex. App.--San Antonio 2004, no pet.)*. In a suit affecting the parent-child relationship, standing is governed by the Texas Family Code, and the party seeking relief must allege and establish standing within the parameters of the language used in the statute. *In re H.G., 267 S.W.3d 120, 124 (Tex. App.--San Antonio 2008, pet. denied)*. Standing cannot be conferred by consent or waiver and may be raised for the first time on appeal. *In re A.M.S., 277 S.W.3d 92, 95 (Tex. App.--Texarkana 2009, no pet.)*.

The Texas Family Code section applicable here provides that "[a]n original suit may be filed at any time by . . . a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding [**3] the date of the filing of the petition . . . ." *TEX. FAM. CODE ANN. § 102.003(a)(9)* (West 2008). The purpose of *section 102.003(a)(9)* is to create standing for those who have developed and maintained a relationship with a child over time. *T.W.E. v. K.M.E., 828 S.W.2d 806, 808 (Tex. App.--San Antonio 1992, no writ)* (examining former Family Code section 11.03(a)(8)).

Margaret asserts Michael failed to plead or prove with any specificity the statutory time period, and she contends Michael failed to plead that he had "actual control" over the two children. Margaret also asserts Michael failed to show he had the legal or constructive authority to guide or manage the children.

We review de novo a challenge to a party's standing. *Tex. DOT v. City of Sunset Valley, 146 S.W.3d 637, 646 (Tex. 2004)*. Ordinarily, a petitioner must allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993)*. When, as here, standing is challenged for the first time on appeal, there is no opportunity to cure a pleading defect. *Id.* "Therefore, when a Texas appellate court reviews the standing of a party [for the first [**4] time on appeal], it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing." *Id.* Accordingly, we construe Michael's petition in his favor and we look to the entire record to determine whether any evidence supports his standing to bring his petition.

*Section 102.003* requires that the petitioner have had actual care, control, and possession of the child "for at least six months ending not more than 90 days preceding the date of the filing of the petition." *TEX. FAM. CODE § 102.003(a)(9)*. In his original petition and his amended petition, Michael alleged he had standing "to bring this suit in that the children have resided with him and have been in his care, custody and control for more than six months." On appeal, Michael explains he did not allege "for at least six months ending not more than 90 days preceding the date of the filing of the petition" because, at the time he filed the petition, his actual care, control, and possession of the children had not ended and was, in fact,

still on-going. As discussed further below, [*151] our review of the record indicates evidence exists to support this contention.

Pursuant [**5] to an October 14, 2004 "Child Safety Evaluation and Plan," Margaret agreed "to voluntarily place the children with the father [Michael]." The plan stated November 14, 2004 as its end date. On October 19, 2004, Michael filed a petition in suit affecting the parent-child relationship in trial cause number 2004-CI-15869 in Bexar County. On November 2, 2004, the trial court entered "Temporary Orders in Suit Affecting the Parent-Child Relationship" ("the 2004 temporary orders"). Pursuant to these orders, Michael was appointed temporary sole managing conservator and Margaret was appointed temporary possessory conservator of both children. Michael had the following "rights and duties" under the orders:

1. the right to have physical possession and to direct the moral and religious training of the children;

2. the duty of care, control, protection, and reasonable discipline of the children;

3. the duty to provide the children with clothing, food, shelter, education, and medical, psychological, and dental care;

4. the right to consent for the children to medical, psychiatric, dental, and surgical treatment and to have access to the children's medical records;

5. the right to receive and give receipt [**6] for payments for the support of the children and to hold or disburse funds for the benefit of the children;

6. except as otherwise provided by the Texas Family Code, the right to the services and earnings of the children;

7. the right to consent to marriage and to enlistment in the armed forces of the United States;

8. the right to represent the children in legal action and to make other decisions of substantial legal significance concerning the children;

9. except when a guardian of the children's estates or a guardian or attorney ad litem has been appointed for the children, the right to act as an agent of the children in relation to the children's estates

if the children's action is required by a state, the United States, or a foreign government; and

10. the right to designate the primary residence of the children and to make decisions regarding the children's education.

Margaret, on the other hand, was given limited visitation with the children and limited authority over the children during her periods of possession.

The temporary orders were to continue in effect until the signing of a final order or further order of the court. The record does not contain any final orders; however, the **[**7]** docket sheet indicates the 2004 case was dismissed for want of prosecution on January 30, 2007. Less than two months later, the trial court considered Michael's motion to reinstate the case on the docket and signed an order of reinstatement on March 6, 2007, which specifically stated the case was reinstated "to the same effect as if it had never been dismissed." The docket indicates the case was again dismissed for want of prosecution on April 8, 2009. One day later, Michael filed the underlying original suit affecting the parent-child relationship that is the subject of this appeal. Nothing in the record indicates Michael's duties under the 2004 temporary orders changed between the date the orders were entered in 2004 and the date Michael filed his new petition on April 9, 2009. In fact, various medical and school records indicate Michael sought medical attention as needed for the children and was involved with their schooling. The record also contains a "Consent to **[*152]** Name Change" form signed by each child, dated November 2, 2009, in which each child identifies Michael as "the man who raised me and who I consider my father . . . ."

We are aware there is some disagreement among the courts **[**8]** of appeals over what constitutes "actual control." The Beaumont Court of Appeals has held that "'control' must mean something more than the control implicit in having care and possession of the child if the word is to be given effect and treated as more than surplusage. The word must be understood in the context of the rights, duties, and responsibilities of a parent." *In re K.C.C., 292 S.W.3d 788, 792-93 (Tex. App.--Beaumont 2009, no pet.).* The court found it significant that there was no evidence the mother ever agreed to relinquish legal rights concerning the child, and in fact, the evidence established the contrary because the mother had refused to give the petitioner, the non-parent who lived with the mother and her child, legal rights concerning the child when he expressed an interest in adopting the child. *Id. at 792.* The court concluded the petitioner lacked standing because, until he obtained the temporary orders at issue in the appeal, he had no legal right of control over the child and no authority to make decisions on behalf of the child. *Id. at 793.* The Fort Worth Court of Appeals has held the petitioners, the paternal grandparents, lacked standing because the respondent-mother **[**9]** did not voluntarily relinquish permanent care, control, and possession of child for the six months preceding the petitioners filing suit because the respondent-mother controlled where the child would stay and for how long and the petitioners did not have such control; and there was no evidence the respondent-mother intended her child to stay with the petitioners for any extended periods of time. *See In re Kelso, 266 S.W.3d 586, 590-91 (Tex. App.--Fort Worth 2008, no pet.).* On the other hand, the Austin Court of Appeals did not agree that "actual control" hinged on whether a petitioner possesses legal authority. *Jasek v. Tex. Dep't of Family and Protective Servs., 348 S.W.3d 523, 532 (Tex. App.--Austin 2011, no pet.).* In that case, DFPS sought to terminate the parental rights of both biological parents and had placed the children with the Jaseks with the intention that the children stay with the Jaseks permanently. The children were later removed from their home after one of the Jaseks tested positive for marijuana. The Jaseks then intervened in the suit affecting the parent-child relationship and DFPS moved to strike their intervention on the grounds they lacked standing. The trial court **[**10]** concluded the Jaseks lacked standing.

On appeal, DFPS argued the Jaseks could not establish that they had "actual control" over the children because, at all relevant times, DFPS had sole legal control over the children. *Id. at 531.* DFPS did not dispute the Jaseks had "actual care" and "actual possession" of the children for the requisite time period. Instead, DFPS argued the Jaseks could not have had "actual control" during that time because that required having the "authority to make legal decisions, decisions of legal significance and including the responsibilities of a legal parent." DFPS insisted that only DFPS had "actual control" over the children because it was vested with the ultimate legal authority to make decisions for the children, including the discretion to remove them from the Jaseks' home at any time. *Id. at 532.* The court of

appeals disagreed that "actual control" under *section 102.003(a)(9)* hinged on whether a caregiver possesses this sort of legal authority.

The Austin court noted that the term "actual" indicates "something that exists in **[*153]** fact, as opposed to something that is a function of legal duties or imputation" and "control" "means the 'power or authority to **[**11]** guide or manage: directing or restraining domination.'" *Id. at 533*. The court concluded "'actual . . . control . . . of the child,' as used in *section 102.003(a)(9)*, means the actual power or authority to guide or manage or the actual directing or restricting of the child, as opposed to legal or constructive power or authority to guide or manage the child." *Id*. The court concluded these words reflected "the Legislature's intent to create standing for those who have, over time, developed and maintained a relationship with a child entailing the actual exercise of guidance, governance and direction similar to that typically exercised by parents with their children." *Id.*; *see also In re K.K.C., 292 S.W.3d at 795* (McKeithen, C.J., dissenting) ("Nothing in the plain language of the statute necessitates the 'relinquishment' or 'abdication' by the biological parent of her parental rights, duties or responsibilities. There is no exclusivity requirement in the statute's plain language. . . . There is, however, a rational basis for conferring standing on a person who shares actual care, control, and possession of a child with that child's parent for a period in excess of six months.").

In her **[**12]** brief on appeal, Margaret alleges Michael failed to show he had actual control, "meaning the actual power or authority to guide or manage" the children. During oral arguments before this court, Margaret invited this court to follow the cases that require a showing that the parent has abdicated actual control of the children in order for the non-parent to show standing. We decline the invitation for two reasons. First, as this court has previously held, the purpose of *section 102.003(a)(9)* is to create standing for those who have developed and maintained a relationship with a child over time. *See T.W.E, 828 S.W.2d at 808*. Second, under any of the standards set forth by our sister courts, we conclude Michael has standing because the record indicates that as of the date he filed the underlying petition, he had not only the actual power and authority to guide or manage the children, he also had the legal power and authority to do so. Therefore, the record contains evidence that supports his standing to bring his petition.

**CONCLUSION**

For the reasons stated above, we affirm the trial court's order.

Sandee Bryan Marion, Justice



**RICHARD W. LEE, ET AL., Petitioner, v. THE CITY OF HOUSTON, ET AL., Respondent**

**No. C-8285**

**SUPREME COURT OF TEXAS**

*807 S.W.2d 290*; *1991 Tex. LEXIS 23*; *34 Tex. Sup. J. 408*

**March 6, 1991, Delivered**

**SUBSEQUENT HISTORY:** [**1] Dissenting Opinion Dated April 24, 1991.
Rehearing overruled by, 04/24/1991
Writ of mandamus granted *Lee v. Downey, 842 S.W.2d 646, 1992 Tex. LEXIS 110 (Tex., 1992)*

**PRIOR HISTORY:** From Harris County; First District.
*City of Houston v. Lee, 762 S.W.2d 180, 1988 Tex. App. LEXIS 2537 (Tex. App. Houston 1st Dist., 1988)*

**JUDGES:** Oscar H. Mauzy, Justice. Dissenting opinion by Justice Raul A. Gonzalez joined by Justice Cornyn.

**OPINION BY:** MAUZY

**OPINION**

[*291] *OPINION*

This cause requires us to examine the scope of the Fire Fighters' and Police Officers' Civil Service Act, formerly *Tex. Rev. Civ. Stat. Ann. art. 1269m*, [1] now codified at *sections 143.001-143.134 of the Texas Local Government Code* ("the Act"). Petitioners, officers in the Houston Police Department, assert that the Act entitles them to promotion with back pay, in addition to declaratory and injunctive relief. The court of appeals reversed the trial court's judgment granting the requested

relief, and rendered a take-nothing judgment against the police officers. 762 S.W.2d at 180. In so ruling, the court of appeals held that the Act applies only to positions requiring the performance of law enforcement duties. *Id.* at 186-87. Because we disagree with that construction of the Act, we reverse the judgment of the court of appeals and remand the cause to the trial court for entry of judgment in accordance with this opinion.

> 1    Act of June 2, 1947, 50th Leg., R.S., ch. 325, 1947 Tex. Gen. Laws 550, as amended, repealed by Act of May 1, 1987, ch. 149, § 49(1), 1987 Tex. Gen. Laws 1306. The actions giving rise to this suit took place prior to codification, and are therefore governed by article 1269m. However, because codification entails no substantive change, see *Tex. Loc. Gov't Ann. § 1.001*, this opinion refers to the codified version of the statute, except where otherwise noted.

[**2] The actions challenged in this suit reflect the City of Houston's ongoing effort to "civilianize" the Houston Police Department (HPD). The court of appeals opinion sets out the pertinent aspects of that effort. In short, the City placed unclassified civilians in managerial positions traditionally held by classified police officers. Petitioners allege that those placements contravened the Act.

The purpose of the Act, as stated in *section 143.001*, is "to secure efficient fire and police departments

composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants." To that end, the Act requires the city council, or other legislative body, to provide by ordinance for the classification of all fire fighters and police officers; that is, to place all such officers within the protection of a civil service system. *Section 143.021.* The proper boundaries of that system, however, are unclear.

In its original form, the Act defined "policeman" as

any member of a Police Department who draws compensation for his services as a member of said department.Tex. Rev. Civ. Stat. Ann. art. 1269m, § 2, Act of June 2, 1947, 50th **[**3]** Leg., R.S., ch. 325, 1947 Tex. Gen. Laws 550, 551. Applying that definition, courts uniformly rejected attempts to remove any police department positions from civil service protection; *all* employees were protected by the Act. *See City of San Antonio v. Handley, 308 S.W.2d 608, 610* (Tex. Civ. App. -- San Antonio 1957, writ ref'd), and cases cited therein.

With a 1957 amendment, however, the Act's definition of "policeman" became less clear, encompassing

any member of the Police Department appointed to such position in substantial **[*292]** compliance with the provisions of Sections 9, 10, and 11 of this Act . . .

Act of June 6, 1957, 55th Leg., R.S., ch. 391, § 1, 1957 Tex. Gen. Laws 1171. [2] Sections 9, 10, and 11 of article 1269m required competitive examinations for appointment to positions in the police department. The codified version of that language, located at *section 143.003(5) of the Local Government Code*, provides simply that a "police officer" is one who was appointed in substantial compliance with chapter 143 of the code. Thus, since 1957, the Act's most important definition has been circular. *Section 143.003(5)* states, in essence, that the Act covers **[**4]** whomever the Act covers.

2 In 1985, the legislature changed the definition again by adding a reference to officers in specialized police forces, and by adding the words "or other peace officer" after the word "Department." Act of June 16, 1985, 69th Leg., R.S., ch. 958, § 21, 1985 Tex. Gen. Laws 3227, 3241 (discussed infra at 5-6).

In the years since 1957, a number of courts have addressed questions regarding the coverage of the Act. Almost all of those cases, however, have involved individuals employed prior to 1957, who automatically maintained their civil service status after the amendment. *See, e.g., City of San Antonio v. Carr, 161 Tex. 155, 338 S.W.2d 122, 124 (Tex. 1960)*; *Clack v. City of San Antonio, 452 S.W.2d 502, 503* (Tex. Civ. App. -- San Antonio 1970, writ ref'd n.r.e.).

One prior court has probed the impact of the 1957 amendment. In *City of Wichita Falls v. Harris, 532 S.W.2d 653* (Tex. Civ. App. -- Fort Worth 1975, writ ref'd n.r.e.), the City had hired a "fire training specialist" **[**5]** without following the procedures set out in the Act for the hiring of classified officers. Eight members of the fire department then brought suit to void the city's appointment. The trial court found that the new position fell within the coverage of the Act. In reviewing that finding, the court of civil appeals noted the fundamental circularity of the Act's terms:

If the Act is construed strictly it would mean that the City could employ new firemen who would not be under Civil Service by simply not giving them an examination. The City acknowledges that this is obviously not the intent of the legislature.*Id. at 657.* To avoid defeating the intent of the legislature, the court construed the Act as a whole. Looking to the job description for the new position, the court observed that "a person holding the position must have knowledge of the principles and practices of fire prevention and suppression." *Id. at 656.* On that basis, the court affirmed the trial court's finding that the position was within the ambit of the Act.

The court of appeals in the present case took a different approach. While noting that the Act should be viewed as a whole, the court placed special **[**6]** reliance on the predecessor to *section 143.023(e)*, which now provides:

An applicant may not be certified as eligible for a beginning position with a police department unless the applicant meets all legal requirements necessary to become eligible for future licensing by the Commission on Law Enforcement Officer Standards and Education.

The only positions that require law enforcement training, the court reasoned, are those that involve traditional law enforcement duties. Thus, the court concluded that the Act encompasses only those

employees who actually do "police work;" that is, those who enforce the law, make arrests, and conduct criminal investigations. We disagree.

Nothing in either the language or the history of *section 143.023(e)* evinces a legislative intent to limit the coverage of the Act. The legislature adopted that provision in 1985, almost forty years after it originally passed the Act. Tex. H.B. 1657, **[\*293]** Act of May 26, 1985, ch. 910, § 4, 69th Leg., R.S., 1985 Tex. Gen. Laws 3046, 3047. If, in passing H.B. 1657, the legislature had intended to restrict the coverage of the Act, it would have amended the statutory provision which purports to establish **[\*\*7]** the Act's scope -- namely, section 2 of article 1269m, now codified at *section 143.003(5) of the Local Government Code*. Notably, on the day after it took final action on H.B. 1657, the 69th Legislature demonstrated that it knew full well how to alter the coverage of the Act. With its adoption of S.B. 540, the legislature extended the coverage of the Act to include specialized police forces, such as park police, airport police, and city marshals, in any city having a population of 1,500,000 or more. Tex. S.B. 540, Act of May 27, 1985, ch. 958, § 22, 69th Leg., R.S., 1985 Tex. Gen. Laws 3227, 3241. [3] To do so, the legislature amended section 2's definition of "policeman" by adding a reference to section 14B, a new section governing such police forces, now found at *section 143.103 of the Local Government Code*. H.B. 1657, in contrast, did not mention section 2.

> [3] In 1983, the legislature apparently tried to effect that change by amending section 14A of article 1269m. Act of June 19, 1983, 68th Leg., R.S., ch. 517, 1983 Tex. Gen. Laws 3006, repealed by Act of June 16, 1985, 69th Leg., R.S., ch. 958, § 21, 1985 Tex. Gen. Laws 3227, 3240-41. The City of Houston, however, refused to interpret that amendment in a manner which would extend all provisions of article 1269m to the specialized police forces. Senate Committee on Intergovernmental Relations, Bill Analysis, S.B. 540, 69th Leg., R.S. (1985). Consequently, the legislature acted in 1985 to achieve its aim directly. Id.

**[\*\*8]** The City argues that a broad construction of the Act would bring *section 143.023(e)* into conflict with the Act's objective, stated in *section 143.001*, of promoting efficiency in the police force. If only licensed police officers can hold managerial positions, the argument goes, then the HPD will be unable to utilize the talents of civilians. The premise of that argument is invalid. *Section 143.023(e)* does not require that all applicants be licensed police officers. Rather, that section requires, by its terms, that applicants meet the requirements necessary to become eligible for future licensure. Any civilian meeting those requirements may apply for a beginning position; and once hired, that individual may become eligible for promotional positions. Under the Act, promotions are determined by performance on promotional examinations, for which any classified employee -- licensed or unlicensed -- may sit, as long as the employee meets certain basic requirements. Section 143.028.

Certainly, there might be instances in which a police department would prefer to hire someone from outside the department, rather than to promote from within. We must presume, however, that the legislature **[\*\*9]** took that possibility into account when it created the Act. Our function is not to question the wisdom of the statute; rather, we must apply it as written. *Jones v. Del Andersen and Associates, 539 S.W.2d 348, 351 (Tex. 1976)*. Moreover, the legislature might reasonably have concluded that the goal of efficiency would be well served by requiring merit-based promotions within the department, rather than giving the department a free hand to hire from without. *See* Note, *Absolute Preferences in Municipal Civil Service Appointments: The Unresolved Conflict With Municipal Discretion,* 64 Mich. L. Rev. 891, 896-97 (1966).

Other provisions, in addition to *section 143.023(e)*, indicate that the legislature intended the Act to have broader application than the court of appeals suggests. Section 143.025(b) requires all applicants to take tests based on "police work *and work in the police department,"* suggesting that the Act's reach extends beyond the performance of traditional "police work." Section 143.102 gives the Chief of Police of a large municipality authority to appoint persons to certain command staff positions, [4] suggesting that the Act would otherwise **[\*294]** require **[\*\*10]** competitive testing for those positions. Section 143.109, which similarly applies only to a large municipality, prohibits crossover promotions of classified employees in specialized technical areas, suggesting that the legislature contemplated the inclusion of at least some members of the technical classes within the civil service system.

4    Subchapter G of the Act, which contains section 143.102, generally applies only to a municipality with a population of 1.5 million or more. Section 143.101(a).

Section 143.102 authorizes the Chief of Police to "appoint a person to a command staff position at the rank of assistant chief." Section 143.102(a). This suit involves the placement of civilians in positions which are allegedly the equivalent of deputy chief positions; that is, positions which are immediately below the rank of assistant chief. Thus, section 143.102 is not directly applicable to this suit. We note, however, that legislative efforts to authorize the Chief of Police to appoint deputy chiefs have consistently failed. See Tex. H.B. 1590, H.B 1697, H.B. 2218, and S.B. 1187, 71st Leg., R.S. (1989).

[**11] In the absence of a clear definition of "police officer," courts should determine the scope of the Act by viewing the statute as a whole. The Act applies to any position requiring a competitive examination. *§§ 143.003*, *143.021(c)*. 5 Such an examination tests an applicant's "knowledge of and qualifications for . . . police work and work in the police department," as well as the applicant's "general education and mental ability." Section 143.025(b). 6 We conclude, then, that the Act applies to any position requiring proficiency in all of those areas. If a particular position requires substantial knowledge of "police work and work in the police department," then it must be classified. Conversely, if a position requires no knowledge of such work, then the position need not be classified. 7 Where the duties and functions entailed by a particular job are undisputed, the determination of whether that job requires knowledge of police work and work in the police department is a question of law for the court.

5  In article 1269m, see sections 2, 8(b), 9(a), and 12(c).

6  The local Fire Fighters' and Police Officers' Civil Service Commission must provide for "open, competitive, and free" entrance examinations, § 143.025, and must also provide for fair promotional examinations, § 143.032. Neither section requires that the commission provide the same test for every classification or position. Rather, the commission may design whatever tests are necessary to meet the particular needs of the department, as long as the tests meet the basic requisites of those sections. See generally Note, Civil Service Commission -- Civil Service Commissions are Generally Accorded Wide Discretion by the Courts in the Preparation and Administration of Examinations to Meet the Public Demand for the Employment of Individuals in the Public Service, 30 Drake L. Rev. 650-52 (1980-81).

Similarly, the commission is authorized to specify age and physical requirements for beginning and promotional positions, and to require appropriate physical examinations. *Section 143.022*. For any given position, the requirements must be the same for all applicants; but nothing in the Act requires the commission to apply the same requirements to every classification or position. Thus, the dissent is flatly wrong in suggesting that a computer genius who is thirty-seven or who has a physical disability is forever barred from supervising the police computer department. Assuming, without deciding, that such a position must be classified, the commission has as much latitude in crafting requirements for that position as it does for any other.

[**12]

7  "Police work," in our view, refers to traditional law enforcement functions. Any broader interpretation would render the phrase redundant. The second half of the phrase, i.e, "and work in the police department," encompasses other activities within the department.

Of course, virtually every position may require some knowledge of "work in the police department." However, to apply the Act on that basis alone would be to ignore the conjunctive term "and." The Act applies only to those positions requiring knowledge of "police work and work in the police department." Some positions requiring knowledge of work in the police department may not require knowledge of police work; consequently, those positions need not be classified.

We recognize that this holding may not resolve all doubts as to whether the Act covers particular positions. However, the legislature's failure to draw a bright line

does not, in itself, authorize a court to draw one of its own. It is the obligation of the legislature, rather than the courts, to develop a workable definition of "police officer." *See Tex. Const.* **[\*\*13]** *art. II, § 1.* [8] A **[\*295]** court may not judicially amend a statute and add words that are not implicitly contained in the language of the statute. *Jones v. Liberty Mutual Ins. Co., 745 S.W.2d 901 (Tex. 1988).*

> 8   We note that the Act, as a whole, has not suffered from legislative inattention. Since the adoption of the new definition of "policeman," the legislature has amended the statute at least thirty-two times. In none of those instances, however, did the legislature address the opaqueness of the statute's most basic provision. Until the legislature clearly defines the scope of the Fire Fighters' and Police Officers' Civil Service System, courts will be left to apply the vague standard we discern today to increasingly complex bureaucracies.

Moreover, the standard we discern today should, in most cases, produce an unequivocal answer as to whether a particular position must be classified. The average patrol officer's duties certainly require knowledge of police work and work in the police department; **[\*\*14]** to that extent, the average patrol officer's position must be classified. On the other hand, the duties of an ordinary clerk-typist in the police department do not require knowledge of police work and work in the police department; so to that extent, the clerk-typist's position need not be classified.

When the duties of a particular position fall outside the scope of the Act, the City may abolish the position, provided it does so in good faith. *Moncrief v. Tate, 593 S.W.2d 312 (Tex. 1980).* As long as the position remains within the civil service system, however, any person holding the position is entitled to the full protection of the Act.

One critical aspect of civil service protection is the right to seek promotion by way of competitive examinations. Section 143.031. For every classified employee, the civil service system offers a career ladder, whereby the officer may work his or her way upward through the ranks. The various ranks, like rungs on a ladder, must comport with the system as a whole; that is, they must be filled by competitive examination, open to all who meet the basic statutory requirements. The Act

does provide special procedures for appointment to positions **[\*\*15]** at the very top of the ladder. §§ 143.013, 143.014, 143.102. At subordinate levels, however, the civil service ladder must remain intact. [9] All positions in the civil service hierarchy -- that is, all classified positions, and all positions entailing the supervision of classified employees -- must be classified, and all appointments to those positions must be made in accordance with the Act. *See International Ass'n of Firefighters v. Townsend, 622 S.W.2d 562, 563 (Tex. 1981).*

> 9   In a city with a population of 1.5 million or more, such as Houston, the Act provides for distinct ladders within specialized police divisions and classes. *Sec. 143.103.* Officers in such divisions are still accorded the benefit of all other provisions in the Act, "including the provisions relating to eligibility lists, examinations, promotions, appointments," etc. *Section 143.103(c).*

Evidence in the present case indicates that the City "declassified" certain top-level job assignments within the HPD. The trial court found that four **[\*\*16]** newly-hired, unclassified employees were performing the same duties, and exercising the same supervisory responsibilities, as deputy chiefs of police, while five others assumed the duties and responsibilities of lieutenants. The unclassified employees thus occupied positions which are, and long have been, integral parts of the HPD's civil service hierarchy. Accordingly, the placement of unclassified employees in those positions contravened the Act.

We do not hold that every high-level position in a police department must be held by a classified employee. If a particular job assignment requires no knowledge of police work and work in the police department, and entails no supervision of classified officers, the position need not be classified. Thus, the Act does not necessarily prohibit the vertical declassification of certain subdivisions within the department. Nor does the Act prohibit the holder of a police license from assuming a job assignment outside of the civil service system, when the assignment requires no knowledge of police work and work in the police department, as defined above.

The Act does, however, prohibit *horizontal* declassification across upper levels of bureaucratic **[\*\*17]** subdivisions, when classified employees hold

subordinate positions within those subdivisions. The removal of such upper-level positions from the civil service system would expose critical job assignments to political influence, and would obstruct the upward progress of classified **[*296]** employees. Such declassification would thus thwart the Act's aim of securing efficient police departments. *Section 143.001.*

We hold that the challenged placements contravened the Act's requirement that all covered positions be filled in accordance with the statutory terms. *Section 143.021(c).* [10] We therefore reverse the judgment of the court of appeals and remand the cause to the trial court for entry of judgment in accordance with this opinion.

> 10 In article 1269m, see section 8(b).

> We do not reach the Petitioners' contention that the Respondents' actions amounted to abolition of existing classified positions. See *City of San Antonio v. Wallace, 161 Tex. 41, 338 S.W.2d 153 (Tex. 1960).*

**DISSENT BY:** GONZALEZ

**DISSENT**

 **[**18]** *DISSENTING OPINION*

Raul A. Gonzalez, Justice

Does the law mandate that a police officer who knows nothing about mechanics be promoted over a civilian master mechanic to be head of the automobile fleet maintenance department of the City of Houston Police Department (HPD)? Did the legislature mandate that only a police officer can supervise other police officers, even if the task at hand requires no special law enforcement skills, or that only a police officer can be in charge of the police computer department, police garage, or Police Training Academy? These absurd consequences flow as a result of the majority opinion and are not supported by logic, prior case law, the statute, or the history of the statute.

I agree with the court of appeals that the Firemen's and Policemen's Civil Service Act [1] (the Act) applies only to positions requiring performance of traditional law enforcement duties such as making arrests, enforcing the law and conducting investigations. Moreover, I do not believe that there has been a showing that any "classified position" has been lost. No one lost their job as a result of the ordinances, and the number of positions within a classification was the **[**19]** same before and after the passage of the ordinances. For these reasons, I dissent.

> 1 *Tex. Loc. Gov't Code Ann. §§ 143.001-.134* (Vernon 1988 & Supp. 1991). References to the "Act" or the "code" are to the Texas Local Government Code unless otherwise noted.

> The case was tried prior to recodification, under *Tex. Rev. Civ. Stat. art. 1269m*, repealed by Act of 1987, ch. 149, § 49(1), 1987 Tex. Gen. Laws 1306. Corresponding references to the prior codification are noted in the footnotes.

The Act provides for the classification of all policemen within the department, and for the promotion of policemen according to their position on eligibility lists compiled from the results of competitive examinations. The Act provides that, except for a few narrow exceptions, "an existing position or classification or a position or classification created in the future either by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter." Code **[**20]** *Section 143.021(c).* [2] In addition to "classified" policemen under the Act, HPD also employs approximately 2,000 employees who do work that does not require the specialized training of police officers, such as clerks, secretaries, computer operators, mechanics, janitors and the like. These employees are protected by another civil service ordinance that covers municipal employees.

> 2 See Tex. Rev. Civ. Stat. Art. 1269m, § 8(b) (repealed).

In recent years, the trend in the HPD has been to "civilianize" the police department: that is, to hire additional civilians throughout the department for managerial and technical roles in order to free up trained police officers for the police work that only classified law enforcement personnel can do. The city ordinances have ranked Houston police officers below the non-classified chief of police in the following classifications, from highest to lowest rank: assistant chief, deputy chief, captain, lieutenant, sergeant, police officer, and probationary police officer. In **[**21]** my opinion, these are the career ladder positions that the Act endeavors to protect.

**[*297]** The city ordinances that the petitioners assert are in conflict with the Act were passed between 1982-1985. [3] These ordinances created nine "civilian" departments or job assignments encompassing some of the duties formerly performed by classified police officers. The ordinances created four police administrator divisions: Planning and Research, Crime Information Center, Police Garage, and the Police Training Academy. The duties assumed by police administrators were formerly assigned to captains. The ordinances also created the following job assignments: two assistant police administrators; urban policy planner IV, an administrative assistant IV, and an education coordinator in the police academy, each of which is roughly equal in salary and assignment to positions held by a lieutenant.

> 3 Houston, Tex., Ordinances 82-1165, 84-1290, and 85-568.

In 1986, the city council passed City Ordinance 86-1278, which implemented **[**22]** a plan for reorganization by creating four new bureaus in HPD: Management Information, Fleet Maintenance, Career Development, and the Office of Planning and Research. The duties and functions of these bureaus were taken from other departments which were assumed into these new bureaus and four civilian administrators were promoted to head these bureaus. Before this reorganization, bureaus were traditionally headed by deputy chiefs.

The petitioners in this case are HPD police officers of various ranks who are at or near the top of the promotion eligibility list for their respective rank. They allege that the hiring of civilians to fill the new positions violates the Act and assert that had the Act been followed, each would have been promoted either into one of the newly created job assignments or into one of the positions vacated by officers who were themselves promoted.

The petitioners argued in their application for writ of error that the mandatory promotion procedures of the Act govern all positions in the HPD, [4] not merely those which entail traditional law enforcement duties. The Act provides:

The commission shall provide for the classification of all fire fighters **[**23]** and police officers. [Code *section 143.021(a)*.] [5]

An existing position or classification or a position or classification created in the future either by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter." [Code *section 143.021*.] [6]

An eligibility list for a beginning position in the fire or police department may be created only as a result of a competitive examination held in the presence of each applicant for the position. . . . A person may not be appointed to the fire or police department except as a result of the examination. [Code section 143.025(b).] [7]

Each person employed by the police department who is a member of the technical or communications class is eligible **[*298]** for a promotion within that class. [Code section 143.109(b).] [8]

Each provision of this chapter relating to eligibility lists, examinations, appointments, and promotions applies to the appointment or promotion of members of the technical, communications, and uniformed and detective classes within the member's respective class. [Code section 143.109(e).] [9]

> 4 In their application, petitioners assert that "the only construction which harmonizes all of the Act's provisions is the one which affords civil service protection to all members of police departments, regardless of whether their job requires police work." This position, shared by the dissent in the court of appeals, *762 S.W.2d 189*, was abandoned by petitioners during oral argument of this case:
>
> J. Mauzy: Counselor, are you taking the position that the state civil service law applies to every employee of the police department?
>
> Attorney for Petitioners: No your honor, I am not.
>
> J. Hecht: You do agree that there are some employees of the police department who are not covered by the statute, and now the squabble is which ones are which?
>
> Attorney for Petitioners: I think that is a possible interpretation.
>
> J. Hecht: In essence there are some employees of a police department who are not

covered by the statute? That is your view?

Attorney for Petitioners: I think that probably is the correct interpretation.

5    See Tex. Rev. Civ. Stat. Art. 1269m, § 8(a) (repealed).

6    See Tex. Rev. Civ. Stat. Art. 1269m, § 8(b) (repealed).

7    See Tex. Rev. Civ. Stat. Art. 1269m, § 9(a) (repealed).

8    See Tex. Rev. Civ. Stat. Art. 1269m, § 14A(a) (repealed).

9    See Tex. Rev. Civ. Stat. Art. 1269m, § 14A(d) (repealed).

The petitioners assert that the court of appeals' construction of "classified positions" as only those positions which require the performance of police work, cannot be harmonized with the broad language of these sections. I disagree. The Act provides that each "police officer is classified as prescribed by this subchapter and has civil service protection." Code *section 143.021(b)*. [10] In my view, the Act's definition of "police officer" controls the scope of the chapter and precludes application of the Act to the disputed job assignments. In my opinion, the Act applies to HPD members who were appointed to their position "in substantial compliance with this chapter [chapter 143, which is the entire Act] or who is entitled to civil service status under **[**25]** Section 143.005, 143.084, or 143.103." Code *section 143.003(5)*. [11]

10    See Tex. Rev. Civ. Stat. art. 1269m, § 8(c) (repealed).

11    At the time of suit, the predecessor to this statute defined policemen as those appointed "in substantial compliance with the provisions of sections 9, 10, and 11 of this Act, or entitled to Civil Service Status under section 14B or 24 of the Act." Tex. Rev. Civ. Stat. art 1269m, § 2. Sections 9, 10, and 11 refer to the qualifications of beginning policemen, as described below.

The majority declares that this definition is circular, arguing that the Act can be avoided by not requiring any standards of applicants. But the fact that the Act can be given one absurd construction does not justify the opposite extreme. From the legislative history and case law concerning who was covered by the Act formerly, along with an analysis of the requirements to become a "police officer" covered by the Act, we can determine the intended scope of the Act.

The earliest predecessor to **[**26]** this section, Article 1269m, section 2, broadly defined "policeman" as "any member of the police department who draws compensation for his services as a member of said department." [12] Act of June 2, 1947, ch. 325, § 2, 1947 Tex. Gen. Laws 550, 551. This definition was construed by some courts to include: juvenile social workers, switch board operators, linemen, clerks, mechanics and other employees incidental to the operation of the police department. See *City of San Antonio v. Handley, 308 S.W.2d 608* (Tex. Civ. App. -- San Antonio 1958, writ ref'd); *City of Wichita Falls v. Cox, 300 S.W.2d 317* (Tex. Civ. App. -- Fort Worth 1957, writ ref'd n.r.e.); *City of San Antonio v. Hahn, 274 S.W.2d 162* (Tex. Civ. App. -- Austin 1954, writ ref'd n.r.e.); *City of San Antonio v. Wiley, 252 S.W.2d 471* (Tex. Civ. App. -- San Antonio 1952, writ ref'd n.r.e.).

12    With the recodification of the act into the Local Government Code, the term "policeman" was replaced by "police officer." *Tex. Local Gov't Code Ann. § 143.003* (Vernon 1988).

**[**27]** In reaction to these cases, the legislature narrowed the scope of coverage of the Act by changing the definition of "policeman." In 1957, Section 2 of the Act was amended to define "policeman" as "any member of the Police Department appointed to such position in substantial compliance with the provisions of Sections 9, 10, and 11 of this Act. . . ." Act of 1957, ch. 391, § 1, 1957 Tex. Gen. Laws 1171. Sections 9, 10, and 11 provided some of the qualifications for entry positions as a policeman. After the 1957 amendment, the Act mandates that we look to the qualifications for appointment to the beginning position of police officer to determine the Act's coverage. [13]

13    Now the code defines a police officer as one appointed in substantial compliance with chapter 143 of the code, i.e., the entire act. *Tex. Loc. Gov't Code Ann. § 143.003(5)* (Vernon 1988).

**[*299]** The majority concludes that because the Act includes a requirement that applicants be tested on their knowledge of "police work and work in **[**28]** the police department," we must expand the Act's coverage beyond traditional law enforcement positions. This section suggests that a good officer has to know

something of the department bureaucracy, but does not mean that department bureaucrats must be police officers. Otherwise, it can just as easily be argued that since the statute requires that all applicants must be able to speak English, [14] all English speakers are covered by the Act.

14 *Tex. Loc. Gov't Code Ann. § 143.023(f)* (Vernon 1988).

I would not restrict the inquiry to the fact that a written exam is required covering the subjects of police work and work in the police department. The Act does not suggest we may select one of the requirements for appointment to an entry position and ignore all others in determining legislative intent. A written examination is not the only requirement imposed on all applicants by these sections. The Act also requires that, generally, no beginning applicant may be over 36 years of age. [15] It also requires that all **[\*\*29]** applicants for the same position meet the same physical requirements. [16]

15 The Act provides:

A person who is 45 years of age or older may not be certified for a beginning position in a police department. A person who is 36 years of age or older and under 45 may not be certified as eligible for a beginning position in a police department unless the person has at least five years' experience as a peace officer or at least five years' of military experience.

*Tex. Loc. Gov't Code Ann. § 143.023(c)* (Vernon 1988). I do not see how the local commission is authorized to make a exception as the majority suggests.
16 The Act requires:

The commission shall set the age and physical requirements for applicants for beginning and promotional positions in accordance with this chapter. The requirements must be the same for all applicants.

*Tex. Loc. Gov't Code Ann. § 143.022(a)* (Vernon 1988). See Tex. Rev. Civ. Stat. art. 1269m, § 9(d) (repealed). While it is possible that the commission could make a "soft track" and a "hard track," I find the simpler explanation to be that the legislature intended to narrow the Act's applicability to those whose job responsibilities

reasonably require them to meet the requirements of the statute, those performing traditional law enforcement duties.

**[\*\*30]** Finally the Act requires all beginning police officers to meet the "legal requirements necessary to become eligible for future licensure by the [Texas] Commission on Law Enforcement Officers Standards and Education." *TEX. LOC. GOV'T CODE ANN. § 143.023(e)* (Vernon 1988). [17] To be eligible for licensing a party must exhibit weapons proficiency. TEX. GOV. CODE § 415.052(a)(5) (Vernon 1990). The Texas Administrative Code defines proficiency in terms of being able to achieve a score of seventy percent shooting various weapons at certain distances. 37 Tex. Admin. Code § 211.104 (1990). Before the court gives too expansive an interpretation to the Act, it should keep in mind that those covered by the Act must meet these additional requirements. It is not true, as the court's opinion would indicate, that all a civilian has to do to qualify for a position is sit down and study for a written examination. Under the court's opinion, a civilian computer genius who is 37 or has a physical disability is forever barred from supervising the police computer department because some employees of the department are police officers. For the same reasons, a civilian master mechanic could not be in **[\*\*31]** charge of the police garage or the best available civilian educator could not be in charge of the police academy. Thus, from the legislative intent to narrow coverage to "police officers," and the nature of the requirements imposed on beginning "police officers," it must be concluded that the Act applies only to the hiring and promotion of employees who were originally appointed to HPD as law enforcement officers, and does not affect HPD's employment of civilians.

17 See Tex. Rev. Civ. Stat. art. 1269m, § 9(e) (repealed).

This common sense interpretation is consistent with the legislative and judicial history of the Act. Favoring a statutory construction without discriminatory implications, **[\*300]** I am convinced that it is the nature of the job and not the qualifications of one's subordinates that determines whether a supervisor must be a police officer. If an officer is performing a job that does not require traditional law enforcement skills, it makes no sense to require that his or her supervisor must **[\*\*32]** be a law officer. I would hold that it is only those

supervisory positions which require the supervision of traditional law enforcement functions that are "classified" supervisory positions.

I disagree that the mere fact that a supervisor supervises classified police officers mandates that the supervisor must also be a police officer as defined by statute. In my opinion, the legislative and judicial history clearly indicates that the 1957 amendment operated as a legislative overruling of the pre-1957 constructions of the Act, and narrowed the scope of the application of the Act to police department employees who perform law enforcement duties.

Petitioners argue that the specific inclusion of specialty positions shows that the Act must have broader application. [18] The fact that the legislature must affirmatively act to extend the Act protection to a class of police department employees implies legislative intent that the Act does not automatically extend to all employees. Also, petitioners ignore the fact that the same statutes expressly preclude the exact "crossover promotions" which petitioners are now seeking:

A member of a particular class is not eligible for promotion to a [**33] position outside that class and lateral crossover by promotion by a member of one class to another class is prohibited. If a member of one class wants to change classes, the member must qualify and enter the new class at the lowest entry level of that class.

*TEX. LOC. GOV'T CODE ANN. § 143.103(b)* (Vernon 1988); see also Section 143.109(c). The Act further provides:

Each provision of this chapter relating to eligibility lists, examinations, appointments, and promotions applies to the appointment or promotion of members of the technical, communications, and uniformed and detective classes within the members' respective class.

Id. Section 143.109.

18 *Tex. Loc. Gov't Code Ann. § 143.103(a)* (Vernon 1988) extends the act to special peace officers such as park police and airport police. Section 143.109 extends the act to a "communications class", which "each person who performs the technical operation of police radio communications", and "technical class" which includes "each person who performs criminal

laboratory analysis and interpretations or the technical aspects of criminal identification and photography." See Tex. Rev. Civ. Stat. art. 1269m, §§ 14A & 14B (repealed).

[**34] Furthermore, as a matter of law there was not a failure to fill a vacancy within a classification in violation of the Act. The Act requires the city council to establish by ordinance the classification of police officers, and the number of positions in each classification. Id. *Section 143.021(a).* [19] The council created the classifications of Assistant Chief, Deputy Chief, Captain, etc. The council does not set forth the job assignment or title that is at issue here. The four positions in question are the heads of (1) the Management Information Bureau (performing the functions of the former Technical Services Bureau, and the Computer Services Division); (2) the Fleet Maintenance Bureau; (3) the Career Development Bureau; and (4) the Office of Planning and Research were created by the Chief of Police, rather than created by ordinance. The number of classified positions were not reduced as a result of the department's reorganization, although some classified officers were transferred to different job assignment. The police civil service system protects *classifications, and positions within the classification*, but does not create a vested interest in any particular *job assignment* [**35] . Since no classified position was lost, as a matter of law the plaintiffs have no cause of action. [20]

19  See Tex. Rev. Civ. Stat. art. 1269m, § 8(a) (repealed).
20  The majority describes a "horizontal" and "vertical" classification system that does not exist either in the facts of this case or in the Act. There is no evidence that the legislature ever contemplated or intended the Act to be analyzed in this fashion. The Act does not discuss non-classified employees of the department, and certainly does not mandate that any supervisor whose duties include the supervision of classified officers must also be classified.

Moreover, there is no horizontal classification in the Act that is not satisfied by the Houston system of providing for the various ranks of the police officers. The Act does nothing more than require that classified police officers be permitted to advance in rank to the same extent after the reorganization of the department as

before. The Houston ordinances satisfy this requirement.

 [**36] [*301] I am as troubled by the questions left open by the so-called "standard" adopted in today's opinion. The court writes:

In the absence of a clear definition of "police officers," courts should determine the scope of the Act by viewing the statute as a whole. The Act applies to any position requiring a competitive examination. [21] (Citations omitted.) Such an examination tests an applicant's "knowledge of and qualifications for . . . police work and work in the police department," as well as the applicant's "general education and mental ability." (Citations omitted.) We conclude, then, that the Act applies to any position requiring proficiency in all of those areas. If a particular position requires substantial knowledge of "police work and work in the police department," then it must be classified.

 S.W.2d at   .

21   None of the nine civilian departments or job assignments in question require the taking of competitive examinations.

Who determines that a particular position requires [**37] knowledge of "police work and work in the police department?" The Mayor? City Council? Police Chief? Police Unions? Civil Service Commission? The Courts?

By its very nature, all supervisory positions require that the supervisor know something about the work he or she is supervising whether in the police department or elsewhere. Does today's opinion stand for the proposition that all supervisory positions within the police department will always be covered by the Act?

I am also concerned that the majority overestimates the effectiveness of its new standard. I disagree that "the standard we discern today should, in most cases, produce an unequivocal answer as to whether a particular position may be classified." S.W.2d . The majority's conclusion that "the duties of an ordinary clerk-typist in the police department do not require knowledge of police work and work in the police department" is not so obvious under this standard. It seems that all employees of the police department must have some knowledge of police work and work in the police department so a court could

conclude that the clerk-typist position was classified under this standard. Furthermore, the argument that [**38] the conjunction "and," S.W.2d at   n.7, solves the problem misses the point -- the proposed standard is still confusing and subject to broad interpretation.

The court of appeals' common sense reading of the statute was much more likely to result in *unequivocal* answers as to whether a position was classified. The court of appeals' standard established that only positions requiring performance of law enforcement duties or supervision of police officers performing law enforcement duties were classified. 762 S.W.2d at 187. Under this standard, there is no way a court could find that a clerk-typist position was classified. Thus, I agree with the court of appeals opinion and would affirm the court of appeals judgment.

Finally, I am concerned with the procedural disposition of this case. The court "hold[s] that the challenged placements contravened the Act's requirement that all covered positions be filled in accordance with the statutory terms," and "reverse[s] the judgment of the court of appeals and remand[s] the cause to the trial court for entry of judgment in accordance with this opinion." S.W.2d at   . This disposition is confusing. What does this [**39] mean? What is the trial court to do? The only guidance given to the trial court to determine if the positions are classified is the majority's so-called new standard: Whether the positions requires proficiency in "'knowledge of and qualifications for police work and [*302] work in the police department,' as well as 'general education and mental ability.'" S.W.2d at   . However, the majority correctly states that whether a position comes within the ambit of the Act is a question of law. S.W.2d at    . Questions of law are within our jurisdiction to render final judgment. Why then does the majority duck rendering judgment in this case? Is this a signal that the court expects for the trial court to conduct an evidentiary hearing before it issues another ruling in this case.

There is no purpose in our remanding this cause to the trial court for it to "enter" (render) a judgment that we can render. Alternatively, if the trial court is to hear more evidence regarding whether the positions in question are classified in light of the court's new nebulous standard, then the whole case should be remanded, in the interest of justice, for new trial. Also, the court of appeals [**40] never reached the city's factual insufficiency points and

today's opinion denies the city their right to a meaningful appellate review.

In conclusion, the majority's convoluted opinion muddles the law and is micro management at its worst. Absent corrective legislation, the court's failure to give clear guidance to the bench and bar will not only serve to keep this case and others like it in the courts for some time to come but will also thwart the Act's purpose of facilitating efficient police and fire departments.

For all of these reasons, I dissent.

DISSENTING OPINION ON MOTION FOR REHEARING

Raul A. Gonzalez, Justice

In its motion for rehearing, among other things, the City of Houston alleges that the court: (1) failed to apply the proper standard of review; (2) misinterpreted the purpose and significance of *section 143.023(e)* of the Firemens' and Policemens' Civil Service Act [1] (the Act); (3) erred by judicially amending the Act to add words not expressly or necessarily implied in the language of the Act; and (4) that the majority opinion is internally inconsistent. I agree.

> 1   *Tex. Loc. Gov't Code Ann. §§ 143.001-.134* (Vernon 1988 & Supp. 1991).

 **[**41]** The constitution grants broad discretionary powers to home-rule cities subject to the limitation that ordinances must not be inconsistent with the constitution or other state statute. *TEX. CONST. art. XI, § 5*; *City of Richardson v. Responsible Dog Owners, 794 S.W.2d 17, 19 (Tex. 1990)*. Therefore, we should hold that a state statute restricts local autonomy only if the legislative intent to do so is unmistakably clear. As we said in Lower Colorado River Authority v. City of San Marcos:

A limitation on the power of home rule cities by general law or by charter may be either an express limitation or one arising by implication. "Such a limitation will not be implied, however, unless the provisions of the general law or of the charter are clear and compelling to that end." *[Glass v. Smith, 150 Tex. 632, 244 S.W.2d 645, 649 (Tex. 1951)]*. The intention of the Legislature to impose such limitation must "appear with unmistakable clarity." [City of *Sweetwater v. Geron, 380 S.W.2d 550, 552 (Tex. 1964)]*.

*523 S.W.2d 641, 645 (Tex. 1975)* (emphasis added). I agree with the City that the petitioners have failed to meet this rigorous burden.

The court holds that the **[**42]** Act proscribes the City's attempt to restructure the police department by ordinance. The City does not advocate an absurdist construction which would "nullify the Act as a whole." S.W.2d    n. 3. There is no dispute that the Act is clearly intended to protect traditional law enforcement positions. The issue here is whether the Act clearly extends coverage beyond such positions. The majority opinion does not demonstrate how this legislative intent appears "with unmistakable clarity." To the contrary, it is replete with observations about the lack of a clear expression of legislative intent. For example the opinion states:

the Act requires the city council, or other legislative body, to provide by ordinance **[*303]** for the classification of all fire fighters and police officers; that is, to place all such officers within the protection of a civil service system. *Section 143.021*. The proper boundaries of that system, however, are not clear.

S.W.2d at    (emphasis added).

With a 1957 amendment, however, the Act's definition of "policeman" [i.e., those covered by the Act] became less clear. . . . Thus, since 1957, the Act's most **[**43]** important definition has been circular.

S.W.2d at    (emphasis added).

Since the adoption of the new definition of "policeman," the legislature has amended the statute at least thirty-two times. In none of those instances, however, did the legislature address the opaqueness of the statute's most basic provision. Until the legislature clearly defines the scope of the Fire Fighters' and Police Officers' Civil Service System, courts will be left to apply the vague standard we discern today to increasingly complex bureaucracies.

S.W.2d at    (emphasis added). Thus the court concedes that there is no evidence of a legislative intent that the Act must cover any supervisor of a classified officer.

In reaching its decision, the court announces a

two-prong test, but fails to apply it to supervisors. Instead, the court announces an additional rule that categorically, supervisors of classified employees must themselves be covered by the Act. It does so based on a concept that "vertical declassification" is permissible while "horizontal" declassification is not. As the City correctly points out in its motion for rehearing, these concepts or categories are nowhere **[\*\*44]** to be found in the language of the Act nor its legislative history. They are of the court's own creation.

The Act unmistakably expresses a policy of providing a career ladder for "police officers" free from political influence. *TEX. LOC. GOV'T CODE ANN. § 143.001(a)*. Nothing in the City's system threatens that policy. If, as here, the number of positions at every rank is not diminished, and a covered officer is afforded the full panoply of rights such as advancement by competitive testing, that policy is served. Another clear policy of the Act is development and maintenance of an efficient and capable police force. Id. This policy is not well served by requiring that positions be filled by persons qualified to be licensed officers without regard for whether those skills are relevant to the job to be performed. This objective is of particular concern given Houston's documented need to devote more qualified personnel to traditional law enforcement duties.

The majority's infringement on local autonomy is unwarranted absent a clear expression of legislative intent to that effect. For these reasons and those discussed in my earlier dissenting opinion, I would grant the motion for **[\*\*45]** rehearing.

Justice Cornyn joins.